Argued 13 July, decided 4 December, 1905; rehearing denied 17 July, 1906.

## MARQUAM *v*. ROSS.

78 Pac. 698, 83 Pac. 852, 86 Pac. 1.

**APPEAL—NATURE OF ORDER DECREEING RIGHT TO REDEEM.**

1. An order adjudging that a party is entitled to redeem from a mortgage sale, fixing the amount to be paid and the time within which the redemption must be made, and determining all the rights of both parties in and to the property, but reserving the details of an accounting for the rents and the distribution of the redemption fund, is a final order determining the rights of the parties, which is appealable, within the meaning of Section 547, B. & C. Comp.

RES JUDICATA.

2. The issues herein were tried in and are concluded by a prior decree between the same parties about the same property.

RIGHT OF TRUSTEE TO PURCHASE TRUST PROPERTY.

3. A trustee holding the title to property will not be permitted to purchase it for his own benefit where his duty as trustee obligates him to secure a maximum price, or where such purchase would be otherwise in contravention or violation of his duty, and if such a purchase is made, equity will consider it as having been for the benefit of the cestui que trust, regardless of the price paid and without reference to actual fraud.

EFFECT OF INSTRUMENT CONVEYING SECURITY.

4. An instrument conveying property as a security for a debt is in equity a mortgage, whatever may be its form.

RIGHT OF MORTGAGEE IN POSSESSION TO PURCHASE.

5. A mortgagee in possession, though in some sense a trustee, is qualified to purchase the security when it is sold at execution sale under his own or a prior lien, as a means of protecting his own claim.

CONSTRUCTION OF TRUST AGREEMENT — MORTGAGEE IN POSSESSION.

6. Plaintiff, owning certain property largely incumbered, applied to a trust company to secure him a mortgage loan thereon. The trust company, being unable to obtain the amount required, agreed to itself loan the balance, in consideration of plaintiff executing a deed of the property to it, and a certain declaration of trust and agreement, which provided that the conveyance was in consideration of securing the loan and in secret trust for the purpose thereafter set out, stipulating for compensation to the trust company for its services in managing the property, collecting rents and profits, and to secure advances. The agreement vested no power of sale in the trust company, nor did it authorize it to convert the property into money. *Held*, that the trust company was a second mortgagee in possession as to the title, and that the trust created was confined to the possession and management of the property, together with the collection and disbursement of the rents and profits, and was therefore terminated on the foreclosure of the mortgage, as the trustee thereafter had no duties to perform.

TRUSTS — DUTY OF TRUSTEE — ADVANCES.

7. A mortgagor, at the time the mortgage was made, deeded the property to a trustee under an agreement that the latter should take possession and collect rents and profits and apply them to interest, taxes, expenses, etc. The deed obligated the trustee to make specified advances, interest on the mortgage not being specifically mentioned, and recited that it might become necessary for the trustee to make other advances, in which case it should be entitled to a lien on the property therefor. *Held*, that the trustee was not bound to make advances to pay interest on the mortgage to prevent a foreclosure.

MISCONDUCT OF TRUSTEE IN POSSESSION.

8. In a suit to redeem certain property from foreclosure sale, evidence *held* insufficient to show that a trustee of the property in possession was responsible for the foreclosure, it appearing that the total receipts were not sufficient to pay interest on a prior mortgage as it became due, even when applied to that purpose, to the exclusion of taxes and other charges.

TRUSTEES — MUTUAL CONSTRUCTION OF CONTRACT.

9. Where a trustee of the rents of mortgaged property makes charges and credits in its account according to its understanding of the agreement under which it holds possession, and where itemized statements of these accounts containing such charges are rendered by such trustee to the mortgagor and retained by him without objection until after suit is brought to foreclose the mortgage, the mortgagor in several instances executing promissory notes for balances shown to be due by such statements, the mortgagor will be held to have accepted the construction of the agreement made by the trustee in so far as it relates to the

right of the trustee to make the charges and credits shown by the statements. In such case the course of dealing constitutes a practical construction of the contract which will bind both parties.

TRUSTEES — EVIDENCE OF MALICIOUS FORECLOSURE.

10. The evidence does not show that the trustee in possession instigated or encouraged the foreclosure of a prior lien, in which proceeding the trustee foreclosed its lien, but it shows affirmatively that the trustee exercised due diligence to avert the foreclosure.

EFFECT OF POWER OF SALE IN DEED OF TRUST.

11. An authority to sell contained in a conveyance of property in trust does not authorize a sale except by a foreclosure and decree, under Section 423, B. & C. Comp., providing that a lien upon real or personal property, other than that of a judgment or decree, must be foreclosed by a suit in equity.

CONSTRUCTION OF AGREEMENT.

12. The supplemental agreement under consideration here was in effect a mortgage of the property therein described to the trustee for the benefit of a named creditor, and it did not change the conditions created by the original contract between the same parties.

From Multnomah : ALFRED F. SEARS, JR., Judge.

Suit by P. A. Marquam against J. Thorburn Ross and three corporations, asserting the right to redeem certain real property from a purchase by Ross at a mortgage foreclosure sale. There was a decree for plaintiff at the circuit. A motion to dismiss the appeal was overruled, the opinion being written by Mr. Chief Justice MOORE, and the case was decided on its merits. The main opinion was written by Mr. Justice BEAN. On a motion for a rehearing, the opinion was written by Mr. Justice HAILEY.

REVERSED.

---

Decided 5 December, 1904.

ON MOTION TO DISMISS THE APPEAL.

*Mr. Edward Byers Watson* and *Mr. Albert Hawes Tanner* for the motion.

*Mr. Wallace McCamant, contra.*

MR. CHIEF JUSTICE MOORE delivered the opinion.

This is a motion to dismiss an appeal. The material facts are that, a mortgage executed by plaintiff to the defendant the United States Mortgage & Trust Co. having

been foreclosed, the real property incumbered thereby was sold under the decree December 10, 1900, and the sale confirmed: *United States Mortgage Co.* v. *Marquam*, 41 Or. 391 (69 Pac. 37, 41). This suit was instituted to redeem the premises from such sale on the ground that the purchaser was plaintiff's trustee, who had unlawfully caused the sheriff's deed therefor to be executed to the Oregon Company, a corporation, which, it is alleged, is not an innocent purchaser. It is stated in the complaint that since December 10, 1900, the plaintiff's trustee and the Oregon Company have been in possession of the mortgaged premises, collecting the rents arising therefrom, amounting to $3,000 a month. The prayer of the bill is for an accounting of the rents and profits of the real property received since the sale; that the sum required of plaintiff to redeem may be ascertained, and the time within which such payments are to be made prescribed; that the purchaser at such sale and the corporations represented by him may be declared plaintiff's trustees, and hold the rents, issues, and profits so collected, and any right, title or estate in the real property acquired by reason of the sale and the sheriff's deed, in trust for him, and be required to convey the same to him upon the payment, within the time to be prescribed, of the sums so ascertained, or that all the real property may be resold; and for such further relief as may be equitable in the premises.

The cause being at issue was tried, resulting in a decree to the effect that the sale of the premises was made to the purchaser thereof, as trustee for plaintiff; that the Oregon Company was not an innocent purchaser; that plaintiff is entitled to redeem the premises sold on paying the sums alleged in the complaint to have been given therefor and interest thereon, to wit, block 178 in the City of Portland, $350,249.97, 80 acres of land in Multnomah County, $10,-000, and lots 1, 2, 3, and 4 in block 120 in the City of Port-

land, $850, $750, $750, and $950, respectively; that plaintiff is entitled to the rents and profits from December 10, 1900; that an accounting should be had to determine the amount thereof, together with deductions therefrom for disbursements, expenses, etc.; and that a referee be appointed to take evidence relating thereto, to state the account and to report the same, so that the balance, if any, may be deducted from the sums required to be paid for redemption; that plaintiff, his heirs or assigns, be allowed to redeem within six months after the decree upon such accounting shall have been entered; that the several defendants may apply to the court to determine when plaintiff shall be deemed barred of his rights under the decree, and also for directions as to which of the defendants is entitled to receive any money paid in redemption; and that plaintiff recover from the defendants his costs and disbursements, taxed at $____. From this decree the several defendants appeal, whereupon plaintiff's counsel interpose this motion, contending that the order sought to be reviewed is only interlocutory. They argue that, as an accounting is a part of the relief demanded, no final decree can be rendered until the account is stated, and that an appeal prior to the rendition of a decree settling such account is premature, and should be dismissed. It is insisted by defendants' counsel, however, that the right to redeem was the primary issue involved, which, having been determined in plaintiff's favor, necessarily carried with it, as an incident thereto, the recovery of the rents and profits accruing since the sale, less certain credits, and, the court having adjudged that defendants should pay the costs and disbursements incurred, the decree is susceptible of immediate execution, thereby precluding further inquiry, except such as is necessary to carry it into effect, and hence it is final and appealable.

1. The statute of this State prescribing what constitutes an appealable judgment or decree is as follows :

"An order affecting a substantial right, and which in effect determines the action or suit so as to prevent a judgment or decree therein, or a final order affecting a substantial right, and made in a proceeding after judgment or decree, for the purpose of being reviewed, shall be deemed a judgment or decree": B. & C. Comp. § 547.

Though it is universally acknowledged that ultimate judgments only are appealable, a great diversity of opinion is to be found in the adjudged cases in respect to what constitutes a final decree. In *McGourkey* v. *Toledo & Ohio Ry. Co.*, 146 U. S. 536 (13 Sup. Ct. 170, 36 L. Ed. 1079), Mr. Justice BROWN, in commenting on this principle, says: "Probably no question of equity practice has been the subject of more frequent discussion in this court than the finality of decrees. It has usually arisen upon appeals taken from decrees claimed to be interlocutory, but it has occasionally happened that the power of the court to set aside such a decree at a subsequent term has been the subject of dispute. The cases, it must be conceded, are not altogether harmonious." In support of the legal principles insisted upon, our attention is called to several cases in which it is held that decrees awarding partition of real property and appointing commissioners to divide the premises equitably do not constitute final adjudications, and that in suits of this kind appeals will not lie, except to review the action of the trial court in disposing of the reports of the referees. These cases, in our opinion, are not controlling. The ancient rule relating to appeals from decrees dividing real property into respective shares, is thus stated by Mr. Justice SCOTT in *Gudgell* v. *Mead*, 8 Mo. 54 (40 Am. Dec. 120): "In proceedings in partition, both at law and in equity, there are two judgments and decrees ; the one interlocutory, and the other final. The first is

'quod partitio fiat inter partes de tenementis,' upon which a writ or commission goes commanding that partition be made; and upon the return of this writ or commission executed, if the proceedings are approved by the court, the second judgment is given 'quod partitio prædicta firma et stabilis in perpetuum teneatur.' This is the principal judgment, and of the other before this is given no writ of error does lie"— citing Thomas' Coke, vol. i, 807, 808. This old mode of partitioning real property is practically reënacted by our statute regulating the procedure in suits instituted for that purpose : B. & C. Comp. §§ 435–483. In construing the provisions of this act it has been held that a decree determining the rights of respective parties to real estate and directing a partition or sale thereof without further proceedings, or to be followed by an ultimate disposition of the report of the referees appointed, is only interlocutory : *Bybee* v. *Summers,* 4 Or. 354; *Sterling* v. *Sterling,* 43 Or. 200 (72 Pac. 741).

Our attention is also called to cases involving injunctions to restrain infringements of patents, in which the causes were referred to ascertain the amount of damages sustained. As such suits are instituted primarily to recover money for a violation of the exclusive rights of the patentee or his assignee, and the injunction is only incidental thereto, the cases are not in point: *Winthrop Iron Co.* v. *Meeker,* 109 U. S. 180 (3 Sup. Ct. 111, 27 L. Ed. 898). In that case it was held that a decree determining the right to and the possession of certain property, which the prevailing party was entitled to have carried into immediate execution, was final, though the trial court retained possession of so much of the decree as might be necessary to adjust the accounts between the parties, Mr. Chief Justice Waite saying : "The case is altogether different from suits by patentees to establish their patents and recover for the infringement. There the money recovery is part of the

subject-matter of the suit. Here it is only an incident to what is sued for." The plaintiff's counsel cite numerous decisions from courts of last resort, state and federal, to the effect that, the rights of parties having been adjudicated, thereby determining the principal issues involved, but ordering a reference for an accounting, such decrees are only interlocutory; and they insist that reason and the weight of authority establish the rule that no decree is final that orders a reference to do what the court, but for its power of delegation, would itself be obliged to do before it could decide it. Whether the preponderance of judicial enunciation is as claimed it is not necessary to inquire, for we believe this court is committed to the doctrine that, where a decree settles the substantial merits of the case, but orders an account between the parties, it is, nevertheless, appealable: 2 Cyc. 588, note 82.

In *Basche* v. *Pringle*, 21 Or. 24 (26 Pac. 863), Mr. Justice BEAN, in speaking of the kind of a judgment from which an appeal will lie, says: "It is one which concludes the parties as regards the subject-matter in controversy in the tribunal pronouncing it. It must be one which not only affects a substantial right, but which, in effect, determines the action." In *State* v. *Security Savings Co.*, 28 Or. 410 (43 Pac. 162), it was held that an order overruling a demurrer to a bill of discovery, and requiring the defendant to answer interrogatories set forth therein, was final for the purpose of taking an appeal, the court saying: "The law, as we understand it, is that an order or decree is final for the purposes of an appeal when it determines the rights of the parties; and no further questions can arise before the court rendering it except such as are necessary to be determined in carrying it into effect." In *Rockwell* v. *Portland Sav. Bank*, 35 Or. 303 (57 Pac. 903), a petition praying that the receiver of an insolvent corporation be required to treat the petitioners as creditors

thereof having been denied, it was ruled that the order was final as determining the rights of the parties. In another trial of the same case (39 Or. 241, 64 Pac. 388,) it was held that an order, made pending the settlement of the estate of an insolvent corporation, allowing a claim and directing the payment thereof by the receiver, was appealable. "The rule," said Mr. Chief Justice WOLVERTON, in *State ex rel.* v. *Downing*, 40 Or. 309 (58 Pac. 863, 66 Pac. 917), "seems to be that, where it is the purpose of the court to pass upon all the questions at issue, and to finally consider and determine concerning them, and make and enter a concluding order respecting them, without any intention of holding the matter in abeyance so that it may subsequently modify or revoke the order, the judgment so entered will be deemed to be final." In *Baker* v. *Williams Banking Co.*, 42 Or. 213 (70 Pac. 711), it was ruled that a decree determining the validity of a claim against a fund in the custody of the officers of a court, derived from the assets of an insolvent corporation, which decree was made prior to the final settlement of its estate, was a final adjudication of the right to participate in the fund, and could not thereafter be controverted by the then parties to the proceeding.

In *Schwartz* v. *Gerhardt*, 44 Or. 425 (75 Pac. 698), in a suit to establish a constructive trust and for an accounting, the relief demanded having been decreed, and an appeal therefrom taken, it was held that the cause was properly reserved for the purpose of an accounting. Mr. Justice WOLVERTON, in deciding the case, says: "The circuit court reserved the matter of the accounting for further hearing and consideration. This was regular, under the practice." In *Lemmons* v. *Huber*, 45 Or. 282 (77 Pac. 836), the merits of the case having been determined in a justice's court, which dismissed the action on the ground that the plaintiff had failed to sustain the allegations of

his complaint, and rendered judgment against him for the costs and disbursements, from which no appeal was taken to the circuit court within the time prescribed, it was held that an appeal from a subsequent action of the justice's court on a motion to retax the costs did not bring up for review the prior decision, Mr. Justice BEAN saying, "A judgment is final for the purpose of an appeal when it determines the rights of the parties." In *Wadhams* v. *Allen*, 45 Or. 485 (78 Pac. 362), a decree dismissing the suit having been rendered, the costs and disbursements were taxed against plaintiffs, to which latter part of the decree they filed objections the day it was entered. More than seven months thereafter the objections were overruled, whereupon plaintiffs appealed, assigning as error the action of the trial court relating to the merits of the case, and not to the taxation of costs. It was held that the appeal was not taken within the time prescribed by law. The cases decided by this court to which attention is called are cited to show the general policy pursued relating to appeals, from which it will be seen that the original adjudication of the right involved within the issues is the judgment or decree from which an appeal lies, and that, if the decree "determines the rights of the parties" on the merits, though it reserves the matter of accounting for further hearing and consideration, it is nevertheless final: *Schwartz* v. *Gerhardt*, 44 Or. 425 (75 Pac. 698).

In *McMurray* v. *Day*, 70 Iowa, 671 (28 N. W. 476), a suit having been instituted to set aside a deed to real property, the relief demanded was decreed, but the cause was referred to ascertain certain items of debt and credit between the parties, and, the account having been stated and filed, a decree was rendered approving it, whereupon defendant took an appeal, but after the statute allowing the right had run against the first decree. It was held that the prior adjudication was a final determination of the substantial

rights of the parties, and that the time for taking an appeal was to be computed from the day the first decree was rendered, and not from the order of the court approving the report of the referee, Mr. Chief Justice ADAMS, saying: "The first question presented is as to whether the original decree of December 17, 1884, is now subject to review. The plaintiffs insist that it is not. Their position is that that decree constitutes a final judgment, and is reviewable in this court only upon an appeal therefrom, taken within six months from the time of its rendition. Counsel for the defendant concede an appeal cannot be taken from a final judgment after six months from its rendition, but they deny that the decree of December 17, 1884, was a final judgment. It was, of course, not a final judgment in the sense that it was the last judgment rendered in the case; but it is manifest that there is another sense in which the words 'final judgment' may be used, and that is to denote the final determination of a substantial right for which the action was brought. This action was brought to determine the plaintiff's right to the land in question. They asserted that right, and the defendant denied it. The court adjudged that the plaintiffs had such right. It is true that there were certain equities in favor of the defendant. He had paid the plaintiffs a certain sum for the land, and was entitled, after accounting for rents and profits, to be reimbursed. The exercise of the right on the part of the plaintiffs was made contingent upon their paying the defendant what he was equitably entitled to. But for that fact there would have been no need of a second decree. But the former adjudication was in no way dependent upon the state of the account, or upon the plaintiffs' payment. Nothing could be developed in the subsequent proceeding which could affect its correctness, or require it to be changed. It was final, we think, if a decree ever can be final where something more is to be ascertained and done in order to

give the party in whose favor it was rendered a right to its enjoyment." The rule announced in that case was approved in *Carter* v. *Davidson,* 73 Iowa, 45 (34 N. W. 603), where a suit was instituted to quiet title to real property, and, a decree having been rendered in favor of plaintiff establishing the right asserted, the cause was continued in consequence of the filing of a petition of intervention. A subsequent decree having been rendered against the intervener and the defendant, the latter appealed therefrom, but after the statute had run against the right of appeal from the original decree; and it was held that the appeal did not bring up for review the prior action of the court.

In *Adams* v. *Sayre,* 76 Ala. 509, a suit was instituted to redeem real property sold under a mortgage on the ground that the purchaser was the mortgagor's trustee, and, a decree having been rendered as prayed for, the cause was referred to state an account between the parties concerning the rents and profits of the premises, to be offset by taxes paid, cost of repairs, and the value of permanent improvements. Thereafter, when the register proceeded to state the account, the complainant at a subsequent term of the court secured a modification of the decree, and, the account rendered having been approved, it was decreed that upon the payment of the sum found due the mortgage should be satisfied. From this latter decree an appeal was taken, and it was held that the trial court was without power to modify the original decree, Mr. Justice SOMER-VILLE saying: "It is the settled doctrine of this court that, as a general rule, there can be but one final decree upon the merits of a chancery cause, which is required to settle all the equities litigated or necessarily involved in the issues of the particular suit. The policy of the rule is found in the indisposition of the appellate courts to mul-

tiply appeals by undertaking 'to review litigated cases piecemeal': *Randle* v. *Boyd,* 73 Ala. 282. A decree may, nevertheless, be partly final and partly interlocutory; final, so far as it determines all issues of law and fact, constituting the equities proper of the cause, and interlocutory as to ulterior proceedings regulating its mode of execution. There may be, therefore, and often are, under our system of chancery practice, two final decrees in the same cause; the one settling the substantial merits of the case, and the other based on the final report of the register, upon an account taken between the parties computing damages, from each of which an appeal will lie to this court." In *Jones* v. *Wilson,* 54 Ala. 50, Mr. Chief Justice Brickell, in speaking of the ultimate conclusion of a court of equity in a case pending before it, says: "The test of the finality of a decree, so as to support an appeal, which our decisions have prescribed, is not whether the cause is still in progress in the court of chancery, awaiting further proceedings, which may be necessary to entitle the parties to the full possession and enjoyment of the rights it has been declared they have, but whether a decree has been rendered settling these rights. If these are settled by the decree, though a reference to the register may be necessary, and may be ordered, to ascertain the amount due from one to the other on the basis of the rights as adjudged, the decree is final, and will support an appeal."

As tending to support the principle here announced that a decree is final though the cause is referred to state an account, see *Decatur Land Co.* v. *Cook,* 125 Ala. 708 (27 South. 1022); *Townsend* v. *Peterson,* 12 Colo. 491 (21 Pac. 619); *Fry* v. *Rush,* 63 Kan. 429 (65 Pac. 701); *Perrin* v. *Lepper,* 72 Mich. 454 (40 N. W. 859); *Hake* v. *Coach,* 105 Mich. 425 (63 N. W. 306); *Ayer* v. *Termatt,* 8 Minn. 96 (Gil. 71); *Arnold* v. *Sinclair,* 11 Mont. 556 (29 Pac. 340, 28 Am. St. Rep. 489); *France* v. *Bell,* 52 Neb. 57 (71 N. W.

984); *Tennessee Railroad Co.* v. *Campbell*, 109 Tenn. 655 (73 S. W. 112).

In the case at bar, the ·issue involved is the right to redeem, and, this having been adjudged in plaintiff's favor, and the property affected thereby particularly described, the sum to be paid therefor specified, and the costs and disbursements taxed to the defendants, the decree, in our opinion, "determines the rights of the parties," is susceptible of immediate enforcement by tendering to the clerk of the court the sums prescribed, with interest, less $3,000 a month, alleged to have been received as rent, leaving the remainder to be paid on confirmation of the referee's report; and is therefore final and appealable.

It follows from these considerations that the motion to dismiss the appeal should be denied, and it is so ordered.

MOTION TO DISMISS OVERRULED.

---

Decided 13 July, 1905.
ON THE MERITS.

Statement by MR. JUSTICE BEAN.

This is a suit by P. A. Marquam against the United States Mortgage & Trust Co., a New York corporation, hereinafter called the "Mortgage Company," The Title Guarantee & Trust Co., an Oregon corporation, hereinafter called the "Title Company," the Oregon Co., and J. Thorburn Ross to redeem block 178, known as the "Marquam Block," and lots 1, 2, 3 and 4, in block 120, in the City of Portland, and 80 acres of land in or near that city from a purchase by Ross, as trustee for the Title Company, at a sheriff's sale, under a decree in a suit brought by the Mortgage Company against Marquam, the plaintiff herein, the Title Company, and others, to foreclose a mortgage on such property, and to require the Title Company and the Oregon Company, its successor in interest, to account for the

rents and profits accruing after the purchase. The facts are these: In August, 1894, the plaintiff was the owner of the property in question, which was incumbered with mortgages and attachments for more than $300,000. His creditors /were pressing him for payment, and he was obliged to secure a new loan or suffer a forced sale of the property. He made application to the Title Company, the local correspondent of the Mortgage Company, for a loan from the latter of $400,000, at 5½ per cent interest, to be secured by mortgage on the Marquam Building, offering, if the loan were made, that the rents of the property should be impounded as additional security therefor, and collected and disbursed by the Title Company. The Mortgage Company declined to make the loan as applied for, but after considerable negotiation finally agreed, on October 16th, to lend $300,000, for five years, at 7 per cent, secured by a mortgage on the Marquam Block and the 80 acres of land; the management and control of the property and the collection of the rents to be in charge of the Title Company during the existence of the loan. The plaintiff was willing to accept this offer. As the $300,000 was not sufficient to pay his pressing demands, however, or relieve his property from liens, the Title Company agreed, at his request, to advance sufficient money to make up the deficiency, such advances to be secured by a lien on the property and the rents subsequent to that of the Mortgage Company. Plaintiff thereupon entered into a contract with two of his attaching creditors, the Portland Nat. Bank and George B. Ellis, which, after reciting his desire to borrow of the Mortgage Company $300,000, and secure the same by mortgage on the Marquam Block and the 80 acres of land, and stating in detail his indebtedness and the claims against the property, proceeds as follows:

"Now, Therefore, This Agreement, entered into on this thirtieth day of October, 1894, by the undersigned parties

interested in the premises, witnesseth : That The Title, Guarantee & Trust Company, acting for and on behalf of the said P. A. Marquam (and said P. A. Marquam hereby agreeing to the terms hereof), does for certain valuable considerations agree to procure for him the necessary funds to discharge the hereinbefore described two mortgages, the taxes for 1893, costs of repairs of roof, fire insurance premiums and expense in securing loan, aggregating three hundred and fifteen thousand dollars ($315,-000), and to procure for the said Marquam funds with which to make a cash payment to said W. W. Cotton, on the indebtedness due the said Ellis of Riverside, California, of thirty-six hundred dollars ($3,600), provided the said suits be both dismissed and said attachment to be released, and provided that upon the execution of the mortgage on said property and notes in favor of the United States Mortgage Company for three hundred thousand dollars ($300,000) said property shall be conveyed by the said P. A. Marquam and Emma Marquam, his wife, to said The Title Guarantee & Trust Company in secret trust to hold the said property and to collect the rents thereof for the following purposes, to wit:

First—To pay the fixed charges for operating the buildings on said premises and to pay for necessary repairs and for services in collecting rents, and to pay the interest on said loan of three hundred thousand dollars ($300,000), and all taxes and other public charges on said property and on said indebtedness.

Second—To pay all amounts to be advanced by said The Title Guarantee & Trust Company for the said Marquam in carrying out the requirements expressed herein, with interest thereon at ten per cent.

Third—To pay pro rata said claims of the Portland National Bank and Mr. Ellis and interest thereon at ten (10) per cent per annum.

Fourth—To pay said The Title Guarantee & Trust Company for its services in executing said trust, and,

Fifth—After said three hundred thousand dollars loan to be made by said the United States Mortgage Company shall be paid off, to reconvey said property to the said P. A. Marquam or to his assigns. .

And the said W. W. Cotton, for and on behalf of his said client, and the said Portland National Bank, in consideration of the premises, do hereby agree to accept a settlement of their said claims in the manner hereinbefore set out. Said action not to be dismissed and said attachment not to be discharged until said trust deed is executed, as above provided, and a certificate of said trust issued to said attaching creditors, reciting the same and the terms of this agreement, duly executed and acknowledged.

                    P. A. Marquam.
                    The Portland National Bank.
                         By W. D. Fenton, of Its Attorneys.
                    George B. Ellis,
                         By W. W. Cotton, His Attorney."

At the time this contract was made, and as part of the same transaction, the plaintiff agreed in writing with the Title Company to pay it $4,500 for exchange, title insurance, brokerage, etc., for procuring the loan, 3 per cent commission on all collections, of whatsoever nature, after October 31, 1894, and $1,000 per annum for its services, together with one sixth of the rents and profits derived from the mortgaged property in excess of what was then being received. On November 13, 1894, the transaction was finally consummated by the plaintiff and his wife executing and delivering to the Mortgage Company a first mortgage on the Marquam Building and the 80-acre tract of land to secure the payment of their promisory notes for $300,000, principal, due five years from date, and 20 interest notes for $5,250 each, one of which matured every three months, also a deed to The Title Company of the mortgaged property and lots 1, 2, 3 and 4, in block 120, absolute in form and purporting to convey the legal title, subject, however, to the prior mortgage, and entered into a written defeasance or agreement with The Title Company as follows:

"This Declaration of Trust and Agreement, entered into in duplicate, on this, the thirteenth day of November, A. D.

1894, by and between P. A. Marquam and Emma Marquam, his wife, of the City of Portland, Oregon, and The Title Guarantee & Trust Company, a corporation, organized and doing business under the laws of the State of Oregon, witnesseth:

That Whereas, in consideration of the premises and of the agreements on the part of the said P. A. Marquam and Emma Marquam hereinafter contained and heretofore understood between the parties hereto, said The Title Guarantee & Trust Company has rendered certain services, and has advanced and will advance certain sums of money, and has secured for said P. A. Marquam and Emma Marquam a loan in the sum of three hundred thousand dollars ($300,000) from the United States Mortgage Company of New York, to secure the repayment of which said P. A. Marquam and Emma Marquam have this day made their certain promisory notes for principal and interest and executed their mortgage to said United States Mortgage Company, covering those certain parcels of real property situated in the County of Multnomah and State of Oregon, and particularly described as follows, to wit:

First, all of block numbered one hundred and seventy-eight (178), containing eight lots, in the City of Portland, Oregon, according to the duly recorded map or plat thereof, said block being bounded on the north by Alder Street, on the east by Sixth Street, on the south by Morrison Street, and on the west by Seventh Street, in said City of Portland; and, second, all of that portion of the John Quinn donation land claim, particularly bounded and described as follows, to wit: Beginning fifteen (15) chains north of the southeast corner of section twenty-five (25), in township one (1), north of range one (1), east of the Willamette Meridian, and from thence running east eleven (11) chains and ninety-four (94) links; thence north twenty-five (25) chains; thence west thirty-two (32) chains; thence south twenty-five (25) chains; thence east twenty chains and six (6) links, to the place of beginning, containing eighty acres of land.

And, Whereas, in consideration of securing said loan, and of the premises, said P. A. Marquam and Emma Marquam have granted and conveyed by deed to said The Title Guarantee & Trust Company in secret trust for the purposes hereinafter set out, all of lots numbered one (1), two (2), three (3) and four (4), in block numbered one hundred and twenty (120), in said City of Portland, in the County of Multnomah, and State of Oregon, and also all of said property described in said mortgage to said United States Mortgage Company, subject, however, to said mortgage.

Now, Therefore, This is to Certify that it is hereby mutually understood and agreed by and between the parties hereto that said P. A. Marquam and Emma Marquam will pay to said The Title Guarantee & Trust Company the sum of four thousand five hundred dollars ($4,500) for exchange, title insurance, abstract of title and brokerage, in the matter of said loan of $300,000, and that during the life of the trust estate hereinbefore mentioned, they, said P. A. Marquam and Emma Marquam, will pay said The Title Guarantee & Trust Company for its services in the financial management and financial oversight of said trust property the sum of one thousand dollars ($1,000) per annum; and the further sum of three per centum (3%) commissions on all collections made in the matter of said trust after October thirty-first, 1894, except on the collection of said $300,000 indebtedness and interest falling due to said United States Mortgage Company, and in further consideration of the premises and of said services rendered and to be rendered, they, said P. A. Marquam and Emma Marquam, will pay unto said the Title Guarante & Trust Company monthly during the life of said trust estate a one sixth part of the net receipts of the income derived from said trust property covered by said mortgage to the United States Mortgage Company, received monthly in excess of the present net monthly income derived therefrom; this present net monthly income for the purposes of this agreement being now estimated and agreed to be one thousand five hundred dollars ($1,500), and this said one-sixth to be computed in the following manner to wit: From the gross monthly income derived from said trust

property covered by said mortgage to the United States Mortgage Company, during each successive month of the life of said trust there must first be deducted the amount of said present net monthly income of $1,500, and, secondly the operating expenses for each respective month pertaining to said trust property covered by said mortgage to the United States Mortgage Company, to wit: The cost of superintendents, engineers, firemen, janitors, porters, watchmen, laborers and teams, of fuel and light, and of janitor's supplies, and of other incidental supplies and repairs, not including, however, any material alteration, improvement or repair of any portion of said property, and then to divide this amount which remains, if any there be, into six equal parts, one of which shall be the one-sixth (1-6) hereinbefore referred to.

And it is Further Hereby Agreed in further consideration of the premises that during the life of said trust said The Title Guarantee & Trust Company shall have absolute, entire and exclusive control and management of said property held in trust as aforesaid, and covered by said mortgage to the United States Mortgage Company for the uses and purposes hereinafter set out, except that it is agreed that the Marquam Building, situate on part of said property shall only be used as an office and store building and not as a lodging house, and that in said matter it shall be under no obligation to said P. A. Marquam and Emma Marquam to keep the buildings on said property held in trust and covered by said mortgage to the United States Mortgage Company rented and to increase or to keep said monthly income up to said present estimated basis of $1,500, other than it shall exercise every reasonable effort to do so ; but it is understood and agreed that it shall take reasonable care of said property covered by said mortgage to the United States Mortgage Company so held in trust, and that during the life of said trust said P. A. Marquam shall have free of charge and rent, office rooms in the Marquam Building, situate on part of said trust property equal to what are now occupied by him therein, and that when the theater in said building shall be leased, the lease shall specify that the theater shall only be run as a first-

class theater and that a box therein shall be reserved, free of charge, for the use of said P. A. Marquam.

And, Whereas, under that certain preliminary agreement entered into between P. A. Marquam and The Title Guarantee & Trust Company and others, on the thirtieth day of October, A. D. 1894, said The Title Guarantee & Trust Company did agree to advance for said P. A. Marquam when said loan of $300,000 should be consummated, the funds in excess of said loan of $300,000, necessary to defray and discharge the following expenses and indebtedness of the said P. A. Marquam named in said preliminary agreement, to wit: The mortgage to the estate of James Phelan of two hundred and fifty thousand dollars ($250,000), with interest and costs accruing thereon, and the mortgage to Dr. A. Sonnenfeld in the sum of twenty thousand dollars ($20,000), with interest accruing thereon and taxes for the year 1893, on said property covered by said mortgage to the United States Mortgage Company, amounting to four thousand one hundred dollars ($4,100), and costs and the indebtedness of the said P. A. Marquam and Emma Marquam for repairs made on the roof of said Marquam Building, amounting to eight hundred and twenty-five dollars ($825), and the fire insurance premiums for policies of fire insurance covering the buildings on said property covered by said mortgage to the United States Mortgage Company coming due and amounting to three thousand one hundred dollars ($3,100) and the sum of $4,500, coming due by said P. A. Marquam and Emma Marquam to said The Title Guarantee & Trust Company for exchange, title insurance, abstract of title and brokerage, the expense in the matter of securing said loan of $300,000, and a cash payment of three thousand six hundred dollars ($3,600) on the indebtedness of said P. A. Marquam to George B. Ellis of Riverside, California;

And, Whereas, it may be necessary in the matter of said trust for said The Title Guarantee & Trust Company to from time to time advance moneys for said P. A. Marquam and Emma Marquam, his wife, it is hereby mutually agreed that when any of said advances are made said P. A. Marquam and Emma Marquam shall execute their joint promis-

sory notes, payable to the order of said The Title Guarantee & Trust Company for each sum so advanced, said notes to be payable on or before two years after the respective dates thereof, unless such dates of maturity shall fall on a day subsequent to the maturity of said $300,000 mortgage to the United States Mortgage Company, in which case said notes shall be drawn so as to fall due at the same time with said mortgage on or before the same becomes due.

It is Hereby Further Understood And Agreed by the parties hereto that the uses and purposes for which the said trust estate shall be held are as follows, to wit: That said lots numbered one (1), two (2), three (3) and four (4), in block numbered one hundred and twenty (120), in said City of Portland, shall be held in trust as collateral security in the premises, the rents and profits thereof during the life of said trust being for the benefit of said P. A. Marquam and Emma Marquam, and the care and management thereof being under the control of the said P. A. Marquam; and that the remainder of said trust property, to wit: The part thereof covered by said mortgage to the United States Mortgage Company is to be held in trust by said The Title Guarantee & Trust Company to carry out the purposes of this agreement, and to collect the rents and profits arising from said property, for the following purposes, that is to say:

First, to pay the expenses and charges for operating said trust property, as hereinbefore set out, and to pay for necessary repairs on said premises, and for services in collecting rents, and to pay the interest on said loan of $300,000, to said United States Mortgage Company, and all taxes and other public charges on said property and on the said indebtedness;

Second, to pay all amounts advanced and to be advanced by said The Title Guarantee & Trust Company for said P. A. Marquam and Emma Marquam as hereinbefore set out, with interest thereon at ten per centum;

Third, to pay pro rata the indebtedness of said P. A. Marquam to said George B. Ellis hereinbefore mentioned, said indebtedness being evidenced by a note of P. A. Marquam to J. M. Wood, dated February first, 1893, and upon

which, after endorsement of the $3,600, hereinbefore referred to, there is unpaid a balance of four thousand one hundred and twenty-six dollars and seventy-seven cents ($4,126.77), and interest from this date at the rate of ten per cent per annum, payable semiannually, and if not so paid to be compounded semiannually, and to bear the same rate of interest as the principal; and the indebtedness of said P. A. Marquam to the Portland National Bank in the sum of fourteen thousand three hundred and ninety-seven dollars and twenty-five cents ($14,397.25), as evidenced by two promissory notes of date October thirtieth, 1894, the one for $7,397.25, payable one year after date, with interest at the rate of ten per centum (10%) per annum, and the other for $7,000, payable eighteen months after date, with interest at the rate of ten per centum (10%) per annum;

Fourth, to pay said The Title Guarantee and Trust Company for its services in executing said trust; and

Fifth, after said loan of $300,000, made by the United States Mortgage Company shall be paid off, and all the requirements of said trust satisfied and complied with, to reconvey all of said property covered by said deed of trust to said P. A. Marquam, so that he shall be repossessed of the fee thereof, and the said Emma Marquam reinstated as to her dower therein, it being understood that said property when so conveyed back shall be returned in as good order and repair as the nature of this trust will admit, and that if at any time all moneys to be paid by said P. A. Marquam and Emma Marquam as set out in this agreement, exclusive of principal and unmatured interest on said mortgage to the United States Mortgage Company, shall be paid, then that portion of the funds arising under said trust not necessary for use in compliance with its terms, shall be thereafter turned over quarterannually to said P. A. Marquam.

In Witness Whereof, said P. A. Marquam and Emma Marquam have hereunto set their hands and seals, and said The Title Guarantee & Trust Company has hereunto caused its corporate name to be subscribed and its corporate seal to be affixed for and on its behalf as its act and

deed, by its secretary, in accordance with due authority
in him vested by its board of directors.

P. A. Marquam.     [SEAL]

Executed in pres-          Emma Marquam.     [SEAL]
ence of P. P. Dabney.      The Title Guarantee &
     [CORP. SEAL]               Trust Company,
                           By J. Thorburn Ross,
                                     Secretary."

On February 13, 1895, a supplementary agreement was
made, defining more clearly the powers of the Title Com-
pany in the matter of the renting of the property, but its
terms are unimportant here. Upon the execution of the
papers referred to the Title Company advanced about
$18,000 from its own funds, being the amount necessary
in excess of the $300,000 borrowed of the Mortgage Com-
pany to pay and discharge the Marquam indebtednss, and
went immediately into possession. Thereafter it managed
and controlled the property, rented the same, made re-
mittances from time to time to the Mortgage Company to
apply on the interest notes due it from the plaintiff, and
rendered statements of the receipts, disbursements and
advances made by it to the plaintiff at stated intervals,
which statements were received and accepted without ob-
jection. The income of the property was not sufficient to
meet the charges against it, and the Title Company for a
time made advances from its own funds to pay the interest
notes in favor of the Mortgage Company as they matured,
until the indebtedness due it from the plaintiff, and se-
cured by the deed and contract referred to, amounted to
from $35,000 to $40,000. It declined to make further ad-
vances, and default was made in the payment of the in-
terest notes to the Mortgage Company falling due Febru-
ary 13, May 13, and August 13, 1899. On October 30th of
that year the Mortgage Company declared the entire debt
due, and commenced a suit in the circuit court for Mult-

nomah County to foreclose its mortgage, making plaintiff herein and the Title Company parties defendant to the suit.

The plaintiff answered in abatement, denying the Mortgage Company's authority to declare the principal sum due for the nonpayment of interest, and setting up that the Title Company was the agent of the Mortgage Company; that, as a part consideration for the loan, the agreement was entered into between plaintiff and the Title Company, as hereinbefore set forth; that the Title Company had collected sufficient funds, over and above the expenses and cost of management of the property, with which to pay the interest notes, but had misapplied and misappropriated them, in violation of its agreement; that by neglecting its duty it had failed to collect as large a sum for rentals as it could and should have collected; and that an accounting was necessary to a proper determination of the matter. For a further defense it was alleged that the Title Company, while acting as agent for the Mortgage Company, at its instance and with its approval, but without the consent of the plaintiff, made sundry leases in violation of its trust. The prayer was for a dismissal of the suit. The material allegations of the plea were denied, and upon a trial it was found, among other things, that the trust agreement was not a part of the contract with the Mortgage Company for the loan, and the Mortgage Company was not a party thereto; that the Title Company was not an agent of the Mortgage Company, so far as it related to the trust agreement, nor had it collected rents and profits sufficient, when applied as stipulated in the agreement, to pay any part of the interest notes maturing February 13, May 13, August 13 and November 13, 1899, nor had it misapplied or misappropriated any part thereof.

The plaintiff here thereupon, by permission of the court, answered to the merits, alleging that the trust agreement was entered into as a part consideration for the loan made by the Mortgage Company; that for a long time prior to the date of the mortgage and agreement the Title Company had been and was the agent of the Mortgage Company for making loans and investments of its money and remitting the interest under an agreement that it should charge and collect from the parties to whom the money had been loaned a reasonable compensation for its services; that the loan to the plaintiff was made in pursuance of this agreement, and that the so-called trust agreement was entered into for the benefit of the Mortgage Company, to enable it to collect and receive interest in excess of that allowed yearly; that by reason thereof it had received unlawful and usurious interest on the loan, and it was therefore void, and the principal sum should be forfeited to the school fund. For a second defense he alleged, as in the plea in abatement, that leases had been made by the Title Company extending beyond the date of the maturity of the mortgage, at the instance and by the consent of the mortgagee, and the lien of the mortgage was thereupon waived, and the Mortgage Company estopped to foreclose the same. For a third defense he alleged that the conveyances and agreement operated as a general assignment of his property, and were void because not made for the benefit of all his creditors. This answer was held insufficient on demurrer.

On November 6th the Title Company filed a cross-complaint, setting up the trust agreement and its operations and doings thereunder, that it had made large advances to plaintiff and wife from time to time, and taken their notes therefor, and had made other advances, for which notes had not been given, and had rendered to them from time to time statements of account, which had been approved and

settled, and that at the date of filing the cross-complaint
there was due and owing from plaintiff to it a large sum
of money, amounting to $40,897.81, with accrued interest,
which was a lien on the mortgaged property, and praying
for a foreclosure of such lien. The plaintiff answered this
cross-complaint, denying the allegations thereof and set-
ting up the trust agreement, averring that the require-
ments of the trust had not been fully satisfied, and it had
not yet terminated; that by the terms thereof the Title
Company was obliged to make further advances and
render further services, and the trust must yet continue
for a further period. For a second defense he averred
that the Title Company was in possession of the property,
assuming and pretending to be engaged in the perform-
ance of its duties under the trust. For a third defense he
alleged that the Title Company had been negligent in
leasing the property, to his damage in the sum of $50,000;
and for a fourth that he had been damaged a large sum
by reason of the failure of the Title Company to pay the
taxes on the property, for which reasons it was sought to
have the cross-complaint dismissed, an accounting had,
and the trust wound up.

After a trial upon the merits the court found that the
Title Company had, from time to time, and frequently
during its control and management of the property, and
as late as June 13, 1899, rendered statements of account
to the plaintiff, whereby it fully disclosed and truly stated
the matters of account between them arising out of the
trust; that no objections were ever made thereto prior to
the month of July, 1899; and that on the 13th of May,
1900, there was due the Title Company from the plaintiff
$24,188.33, exclusive of attorney's fees; that the Title
Company had been prudent, careful and diligent in rent-
ing the various properties, and in conducting and man-
aging the trust, and had been guilty of none of the negli-

gence, carelessness or malfeasance specified; that the trust agreement had been fully carried out and completed; that it was in effect a mortgage, and constituted the Title Company a mortgagee in possession. A decree was thereupon rendered against the plaintiff, in favor of the Mortgage Company, for $345,875.66, principal and interest, exclusive of attorney's fees and costs; the Title Company, for $21,511.42; W. S. Mason, for $14,397.25; and George B. Ellis, for $4,126.77—besides attorney's fees and costs, and ordering that the mortgage be foreclosed, the mortgaged property sold in the manner provided by law, and the proceeds applied in payment of the costs of the suit and accruing costs and the several judgments in the order of their priority. Execution was subsequently issued on the decree by order of the court, and the mortgaged property was sold by the sheriff of Multnomah County to the defendant Ross, as trustee for the Title Company, on December 10, 1900; he being the highest and best bidder therefor. A short time afterward the Title Company was required by the court to render a final statement of its accounts as trustee, which were approved, and the company was discharged. The sale to Ross was subsequently confirmed, and after due time a sheriff's deed was made to him. Appeals were taken by the plaintiff from the decree in the foreclosure suit and the order confirming the sale, both of which were affirmed: *United States Mortg. Co.* v. *Marquam*, 41 Or. 391 (69 Pac. 37, 41). The Title Company afterward caused the defendant the Oregon Company to be organized by its officers and agents, and at its instigation Ross conveyed the property to the latter company. In November, 1902, this suit was brought for the purpose of having the defendants declared to hold the title to the property in trust for the plaintiff, and for permission to redeem, on the ground that the relations between the plaintiff and the

47 Or.——26

Title Company at the time the purchase was made by Ross were such that it could not purchase for its own benefit, and that the foreclosure sale was procured and instigated by its wrongful act. The plaintiff had decree, and the defendants appeal.                     REVERSED.

For appellants there were briefs over the names of *Wallace McCamant, William Paine Lord* and *Zera Snow*, with oral arguments by *Mr. McCamant* and *Mr. Lord*.

For respondent there were briefs over the names of *Watson, Beekman & Watson, W. D. Fenton* and *Mitchell & Tanner*, with oral arguments by *Mr. Edward Byers Watson* and *Mr. William David Fenton*.

MR. JUSTICE BEAN delivered the opinion of the court.

2. We are strongly impressed with the view that the decrees in the suit brought by the Mortgage Company to foreclose its mortgage are a bar to this proceeding. The plaintiff and the Title Company were both parties to that suit, and both answered. The Title Company set up the contract between it and the plaintiff, its doings thereunder, the amount of advances made by it, claimed a lien on the property therefor, and prayed a foreclosure thereof. The plaintiff joined issue on the answer, averred that the trust relation had not terminated, but must continue for an indefinite period, and that the Title Company had been unfaithful to its trust. The question of the relationship of the Title Company to the plaintiff and the property, and the manner in which it had discharged its trust were therefore put in issue, and fully tried and determined in that suit. It was adjudged and decreed that the Title Company had been faithful to its trust, and had properly accounted for all moneys received by it on account thereof; that it was in effect a mortgagee in possession, and had a lien on the property for the amount advanced by it, which lien was foreclosed and the property ordered sold to satisfy

the same. The questions thus determined are the ones sought to be litigated in this case, and the decree would seem, therefore, to be a complete determination of the rights of the parties, and a bar to subsequent litigation between them upon the same claim or demand: *Ruckman v. Union Ry. Co.*, 45 Or. 578 (78 Pac. 748). On account of the importance of the case, however, the amount involved, and the zeal and learning exhibited by counsel on both sides, we have examined and decided the case on the merits, regardless of the effect of the former adjudication. The argument has taken a wide range, but the consideration of many questions which have been ably and exhaustively discussed is rendered unnecessary by the view we have taken of the matter.

The principal, and, indeed, the controlling, question is whether the Title Company, at the time of the sale under the decree in the foreclosure suit brought by the Mortgage Company, sustained such a relation to the property or to the plaintiff that it was disqualified under the law from purchasing for its own benefit. The contention of the plaintiff upon this point involves substantially two propositions : (1) That under the contracts between him and the Title Company the latter became a trustee of the title to the property in question, and that, such relation not having been terminated at the time of the sale, it was disqualified to bid or to purchase such property on its own account; (2) that, if the trust had terminated and the trust relation ended, the Title Company had been guilty of breaches of duty during its existence, designed to and which did bring about the foreclosure and sale, which made it a trustee ex maleficio. The court below held upon the testimony that the Title Company had in every respect been faithful to its duty, and guilty of no breaches of trust, but, as a matter of law, it was disqualified to purchase,

because of the relationship existing between it and the plaintiff at the time of the sale.

3. It is a familiar rule of law that a purchase by a trustee or person occupying a fiduciary position, in contravention or violation of his duties, is in equity made for the benefit of the cestui que trust, at his election, regardless of the amount paid, or whether there was actual fraud or not. In such a case the court will not try the question of the bona fides of the purchaser or the adequacy of the consideration. The fiduciary character of the purchaser, when the circumstances are such that to allow him to purchase for himself would tempt him to act for the protection of his own interest and the consequent injury of those whom, as trustee, he is bound to protect and serve, will be sufficient. It is enough that there is a conflict between duty and self-interest. The law will not allow the matter of self-gain to stand as a temptation to misconduct in the discharge of the duty growing out of the fiduciary relation. A trustee will not be permitted to subject himself to the temptation which arises out of the conflict between the interest of a purchaser and his duty as a trustee: 28 Am. & Eng. Enc. Law (2 ed.), 1016; 4 Kent, Comm. *438; 1 Story, Equity (13 ed.), § 322; 1 Perry, Trusts (5 ed.), § 205; *Davoue* v. *Fanning*, 2 Johns. Ch. 252.

A trustee with a power of sale cannot therefore purchase at his own sale. Neither can a trustee whose duty it is to convert the trust property into money for the benefit of his principal or his creditors purchase at a sale made by himself or by his direction, or, under many authorities, upon a judgment or decree based upon a paramount title or adverse proceeding: *Van Epps* v. *Van Epps*, 9 Paige, 237; *Jewett* v. *Miller*, 10 N. Y. 402, 405 (65 Am. Dec. 751); *Davoue* v. *Fanning*, 2 Johns. Ch. 252; *Downs* v. *Rickards*, 4 Del. Ch. 416; *Lewis* v. *Welch*, 47 Minn. 193 (48 N. W. 608, 49 N. W. 665); *Carson* v. *Marshall*, 37 N. J. Eq. 213; *Hamil-*

*ton* v. *Dooly*, 15 Utah, 280 (49 Pac. 769); *Michoud* v. *Girod*, 45 U. S. (4 How.) 503 (11 L. Ed. 1076). Upon this latter point there is a sharp conflict in the decisions (*Earl* v. *Halsey*, 14 N. J. Eq. 332; *Chorpenning's Appeal*, 32 Pa. 315, 72 Am. Dec. 789; *Anderson* v. *Butler*, 31 S. C. 183, 9 S. E. 797, 5 L. R. A. 166; *Allen* v. *Gillette*, 127 U. S. 589, 596, 8 Sup. Ct. 1331, 32 L. Ed. 271; *Fisk* v. *Sarber*, 6 Watts & S. 18), but it is unnecessary at this time for us to examine the adjudged cases, or attempt to deduce any general rule from them, if, indeed, it is possible to do so. It will probably be found on investigation that the decision in each case depends upon the application of the general rule of disqualification to the particular facts, and that, where there was a conflict between duty and self-interest, the purchase was held voidable, regardless of the manner in which or by whom the sale was made, and where there was no such conflict, it was upheld.

The decision of the case in hand depends upon the construction of the contract between the plaintiff and the Title Company, and the relation which the parties sustained to each other by reason thereof. When we have arrived at this determination, the way is clear. If it was such that there was a conflict between duty to the plaintiff and self-interest of the Title Company at the time of the sale under the foreclosure decree, the plaintiff must prevail; otherwise, his suit fails on this branch of the case. In construing a contract the object is, of course, to ascertain the intention of the parties, from the language used, in the light of the surrounding circumstances. Recurring, then, briefly, to some of the facts, for the purpose of showing the condition of things prior to and at the time of the execution of the deed from plaintiff to the Title Company and the making of the so-called trust agreement, so as to enable us to understand better their object, it appears that at the inception of the negotiations the parties were dealing with

each other at arm's length. There was no relation of trust or confidence between them. The plaintiff was the owner of valuable property, which was heavily incumbered and about to be sold to satisfy the liens against it. He had made repeated efforts, without success, to procure money with which to meet his obligations. Under these circumstances he applied to Mr. Ross, the manager of the Title Company, whose assistance he invoked in extricating his property from the embarrassment which threatened it, a part of the company's business being to procure loans for other parties. Ross undertook to furnish the desired aid through the Mortgage Company, his correspondent in New York, and after much negotiation finally succeeded in procuring a loan of $300,000 from it. This sum was not sufficient to satisfy the demands against the plaintiff and his property. Ross accordingly agreed, at the plaintiff's request and on behalf of the Title Company, to make certain advances, amounting to about $18,000, to meet this deficiency.

To secure the payment of the loan and the advances made and to be made by the Title Company was the primary object and purpose of the several instruments. To accomplish this, plaintiff gave a mortgage to the Mortgage Company direct, and made and delivered a deed, absolute in form, to the Title Company and the so-called trust agreement for the purpose of impounding the rents and revenues from the mortgaged property. These several instruments were entered into contemporaneously, and as a part of the same transaction. Their sole object and purpose was to secure the payment of the money borrowed from the Mortgage Company, and that which was advanced and to be advanced by the Title Company, the payment of the cost of maintaining and operating the property, the agreed compensation for the services of the Title Company in its management and control, the taxes thereon, and cer-

tain indebtedness to Ellis and the Portland National Bank. That such was the purpose of the transaction is apparent from the language of the agreement, providing for the reconveyance of the property to the plaintiff upon the payment of the indebtedness, and from the relation of the parties. They were dealing with each other as borrower and lender, not as trustee and cestui que trust. The desire of the plaintiff was to secure funds with which to pay and discharge the incumbrances against his property, in order to prevent a forced sale thereof. The object of the Title Company was to obtain security for the money loaned by the Mortgage Company, and for such as might be advanced by it.

4. The fact that one of the instruments that was given to accomplish this purpose is in form an absolute deed, and the other is denominated a "trust agreement," does not change their legal effect. A deed or agreement of trust, intended as security for a debt, performs the office of a mortgage, and is in effect nothing more than a mortgage. The fact that it is absolute in form does not change its character from a security to an absolute conveyance. When it appears that the instrument is intended as security for the payment of money, it will be treated and deemed in equity as a mortgage, whatever its form. This rule has been so often announced and enforced by this court that a mere citation of the authorities will suffice: *Hurford* v. *Harned*, 6 Or. 362; *Stephens* v. *Allen*, 11 Or. 188 (3 Pac. 168); *Thompson* v. *Marshall*, 21 Or. 171 (27 Pac. 957); *Adair* v. *Adair*, 22 Or. 115, 132 (29 Pac. 193); *Marx* v. *La Rocque*, 27 Or. 45 (39 Pac. 401); *Security Trust Co.* v. *Loewenberg*, 38 Or. 159 (62 Pac. 647).

The agreement and deed were executed contemporaneously, as a part of the same transaction, and are in legal effect but one instrument. The declaration that the conveyance was made "in secret trust," to collect the rents

and profits for the purpose of paying the cost of operating and maintaining the property and certain specified indebtednesses of the plaintiff, and the provision for a reconveyance upon the performance of the conditions imposed, show that the deed was not intended as an absolute and indefeasible conveyance. By an absolute deed of trust the grantor parts with the title, which vests in the grantee unconditionally for the purposes of the trust, with no right of reconveyance to the grantor (*Ladd* v. *Johnson*, 32 Or. 195, 49 Pac. 756); but a deed of trust, designed as security for money, creates a mere lien, and is in legal effect a mortgage: *Thompson* v. *Marshall*, 21 Or. 171 (27 Pac. 957). It seems to us, therefore, that the Title Company's relation to the property, under the law and the facts, was that of a mortgagee in possession, with certain added duties and obligations, arising out of a special contract, rather than as a trustee of the title; and such was in effect the holding of this court in the former case: *United States Mortg. Co.* v. *Marquam*, 41 Or. 391 (69 Pac. 37, 41).

5. And a mortgagee in possession is not such a trustee as will prevent him from purchasing the mortgaged property at a public sale: *Ten Eyck* v. *Craig*, 62 N. Y. 406. If, however, it be deemed, as held in *Title Guarantee & T. Co.* v. *Northern C. Invest. Trust* (C. C.) 73 Fed. 931, that the title passed by the deed from the plaintiff to the Title Company, as against strangers, the rights of the Title Company in the property and of the parties as between themselves were fixed and defined by the so-called trust agreement. The case stands exactly as if such trust agreement had been embodied in and made a part of the deed of conveyance. Unless, therefore, it imposed duties upon the Title Company which were in conflict with its right to protect its own lien for advances made and to be made by purchasing at the foreclosure sale, its title must be upheld.

6. Now, when we turn to this agreement, we find that it did not vest the Title Company with power of sale of the mortgaged property, nor did it require it to convert the property into money, or authorize or empower it to do so. It did not purport to affect the title in any way, but only the possession and the right to the income. The agreement recites the mortgage to secure the payment of $300,-000 to the Mortgage Company, the conveyance of the mortgaged property to the Title Company, "in consideration of securing the loan * * in secret trust for the purposes hereinafter set out," stipulating the compensation to be paid the Title Company for its services in the matter of the control and management of the property and the collection and disbursement of the rents and profits, and the agreement of the Title Company to advance sufficient funds which, with the $300,000 borrowed from the Mortgage Company, would pay and discharge certain specified indebtednesses of the plaintiff, for which plaintiff and wife agreed to —

"Execute their joint promissory notes, payable to the order of said The Title Guarantee &' Trust Company for each sum so advanced, said notes to be payable on or before two years after the respective dates thereof, unless such dates of maturity shall fall on a day subsequent to the maturity of said $300,000 mortgage to the United States Mortgage Company, in which case said notes shall be so drawn so as to fall due at the same time with said mortgage or before the same becomes due."

The agreement then further provides:

"It is hereby further understood and agreed by the parties hereto that the uses and purposes for which said trust estate shall be held are as follows":

The four lots in block 120, "as collateral security," the control and management thereof to be in the plaintiff, and the rents and profits to go to him; the remainder of the property "to carry out the purposes of this agreement, and

to collect the rents and profits arising from said property, for the following purposes:  *  *

First, to pay the expenses and charges for operating said trust property,  *  *  pay for necessary repairs on said premises, and for services in collecting rents, and to pay the interest on said loan of $300,000 to said United States Mortgage Company, and all taxes and other public charges on said property and on the said indebtedness.

Second, to pay all amounts advanced and to be advanced by" the Title Company, "with interest.  *  *

Third, to pay pro rata the indebtedness of" the plaintiff "to said George B. Ellis," and the "Portland National Bank.  *  *

Fourth, to pay" the Title Company for its services in executing the said trust; and

Fifth, after said loan of $300,000  *  *  shall be paid off, and all the requirements of said trust satisfied and complied with, to reconvey all of said paid property, etc., to the plaintiff.

It will thus be seen that the trust created by the agreement was confined to the mere possession of the property, and was limited to its management for the purpose of collecting and disposing of the rents and profits for certain specified objects. It was simply a part of the scheme for securing the payment of the loan from the Mortgage Company, the advances made and to be made by the Title Company, and other specified indebtedness of the plaintiff, by impounding the rents and profits of the property as additional security therefor. It and the deed were intended to serve a double purpose — to furnish security by a lien upon the property for the money advanced by the Title Company and the indebtedness to Ellis and the bank, and to provide a means of paying interest, taxes, repairs, etc., out of the rents, issues and profits, and, if not sufficient, then out of the proceeds of the property itself. The

first purpose was provided for by the deed, and the latter by the agreement. There being no power or authority vested in the Title Company to sell, convey or dispose of the corpus, there was no means provided by which it could make the amount of its lien for advances, if the rents, issues and profits were not sufficient for that purpose, except to fall back upon the agreement itself, or the security afforded by the deed for the payment of such advances and indebtedness, and this could only be worked out by foreclosure in equity, as would be the case if the transaction were a mortgage proper. The trust being thus confined to the control and management of the property and the collection of the rents and profits thereof, for the purpose of paying and discharging certain liens and incumrances, it is manifest that the trust relation was terminated and ended by the decree in the foreclosure suit brought by the Mortgage Company to foreclose its mortgage; and such is the construction given to the contract by this court in *United States Mortg. Co.* v. *Marquam,* 41 Or. 391, 403 (69 Pac. 37, 41).

The court at that time had the contract before it, and its construction was a material question for consideration and decision, because it involved the right of the Title Company to appear and answer in such suit—a point stoutly contested by the present plaintiff. In discussing this question Mr. Justice WOLVERTON, speaking for the court, says: "The trust agreement, as shown by its terms and conditions, was entered into to enable the Title Company to manage the property, and from the rents and profits arising therefrom to discharge the expenses of management and interest charges on the mortgage, so far as they were sufficient, and, if there was a surplus, to apply it pro rata to certain specified indebtedness of Marquam and wife, and after these to apply it on the principal sum for which the mortgage was given. The life of the trust was made

dependent upon the existence of the mortgage, and the Title Company was given a lien for advances made in pursuance of the stipulations contained in the trust agreement, so that a foreclosure of the mortgage would necessarily put an end to the trust relations. Regardless of any stipulations of the parties, such foreclosure would deprive the trustee of the subject of the trust to operate upon, and the agreement would henceforth become inoperative. It was therefore incumbent upon the Title Company, when made a party, to answer, setting up its duties and obligations in the premises, as well as its rights and interest in the property; and, having a lien, whether it comes by a trust agreement, technically speaking, or an instrument more properly denominated a mortgage, it has as good a right to have it foreclosed as if it were plaintiff in the suit."

This is a clear and succinct statement of the effect of the so-called trust agreement and the relation of the parties arising therefrom. It created a trust, conditioned on the life of the mortgage. The purpose was to provide a fund for the payment of operating expenses, repairs, interest charges, etc., in order that a foreclosure might be averted. When default occurred and the mortgage was foreclosed, the trust agreement no longer served the purpose of its creation, and the trust was necessarily at an end. The agreement was dependent for its vitality upon the existence of the liens on the property, and necessarily terminated, and the powers and duties of the trustee ceased, when the liens were merged in the decree in the foreclosure suit. The rights of all the parties, including that of the Title Company, were litigated in such suit and merged in the decree, and thereafter had to be worked out through it. As a party to the foreclosure suit, the Title Company had a right to and did set up its lien, and obtained a decree ordering the sale of the property pledged as security therefor.

Such foreclosure necessarily put an end to its custody and control of the property for the purposes stated in the so-called trust agreement, and thereby extinguished the trust relation as such. It could no longer collect and disburse the rents and profits, or manage and control the property for the purpose specified. It was therefore deprived of its duties as trustee, and of the control and custody of the subject-matter of the trust, at the time of the sale, and had a right to bid in the property to protect its lien the same as any other lien creditor: *O'Reiley* v. *Bevington,* 155 Mass. 72 (29 N. E. 54); *Preston* v. *Loughran,* 58 Hun, 210 (12 N. Y. Supp. 313); *Felton* v. *La Breton,* 92 Cal. 457, 461 (28 Pac. 490); *Anderson* v. *Butler,* 31 S. C. 183 (9 S. E. 797, 5 L. R. A. 166); *Boyer* v. *East,* 161 N. Y. 580 (56 N. E. 114, 76 Am. St. Rep. 290).

The rule invoked by plaintiff, which disqualifies a trustee from purchasing the trust property because inconsistent with his duties, can have no application to the Title Company, under the facts and the law of this case. "Jealous as courts of equity are in watching over the conduct of a trustee in connection with the object of his trust," says the Supreme Court of Illinois, "he is only forbidden by them from dealing with the trust property for his own benefit so long as the trust continues. The moment it ceases he occupies precisely the same relation towards it that strangers to the trust do, and, acting in good faith, he may then become its owner, by purchase or otherwise": *Munn* v. *Burgess,* 70 Ill. 604, 611. And, as said by the Supreme Court of Kentucky, in *Waring's Executor* v. *Waring,* 10 B. Mon. 331: "When, therefore, the powers of the trustee ceased by the limitation contained in the trust itself, he had no longer any right to retain the trust estate in his hands; and, having died without having transferred it to the beneficiary, or made any disposition of it for her use and benefit, the court below very properly decreed its pay-

ment by the executors out of the estate in their hands." The duties of the Title Company were brought to an end by the decree in the foreclosure suit. It was thereby relieved of any disability it may previously have been under because of the trust agreement, and enabled to purchase the property on its own account and for its own benefit: *Ball* v. *Carew*, 13 Pick. 28; *Shakeley* v. *Taylor*, 1 Bond, 142 (Fed. Cas.) No. 12,698; *Robertson* v. *Chapman*, 152 U. S. 673 (14 Sup. Ct. 741, 38 L. Ed. 592). It had a right to and did foreclose its lien in such suit, and this carried with it the right to protect itself by bidding at the sale under such decree, unless the suit was due to its wrongful acts: *New Memphis Gaslight Co. Cases*, 105 Tenn. 268 (60 S. W. 206, 80 Am. St. Rep. 880); *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587 (23 L. Ed. 328); *Preston* v. *Loughran*, 58 Hun, 210 (12 N. Y. Supp. 313).

In this connection let us apply the test that the trustee shall not be permitted to deal with the corpus for his individual benefit or protection, where self-interest will conflict with the duty he owes to the cestui que trust, and thus determine whether the Title Company has violated the rule. Its duty was to collect and apply the rents, issues and profits arising during the life of the agreement, that is, so long as the trust relations, if they may be so called, continued. When these relations ceased or were brought to an end, there was nothing left under the agreement for it to do, no duty pending or owing to the plaintiff. Was it bound thenceforth to fold its hands and watch the disintegration of the property upon which it had a lien, wholly powerless to protect itself from loss by interposing its bid? It had an interest in the property to subserve, and why could it not protect that interest by taking over the property? Its stipulated duty had been fully performed. The foreclosure of the paramount lien had rendered it powerless to do more. This very contingency was

within the contemplation of the parties when the agreement was entered into, so that, the duty having come to an end under the very terms and spirit of the agreement, there could be no further impediment in the way of the Title Company protecting itself. Marquam had been served as fully by the Title Company as he had stipulated for under the agreement, and, to require more, the duty must be found to rest elsewhere than upon the contractual relations of the parties. But, the Title Company having discharged its duty to the plaintiff, there was nothing left to conflict with self-interest, and, having an interest in the property to subserve, it could properly bid for the protection of that interest. We are unable to find any duty resting elsewhere, under any principle of equity with which we are familiar, requiring more of the Title Company than it was bound to perform by the terms of its agreement. When such duty ended without its fault or connivance by the foreclosure under the paramount lien, then was it free to act as any other creditor in the protection of its interest. This must be so, upon the plainest principles of equity and fair dealing. No authorities have been presented that in any way militate against this conclusion, nor have we been able to find any; while, on the other hand, it finds ample support in the cases above cited. If there had been a redemption by Marquam, and an accounting by the Title Company had been required, it would have been by reason of the law regulating redemptions, and not by virtue of any subsisting contractual relations between the parties.

7. The remaining question is one of fact. It is asserted that the conduct of the Title Company in the matter of the execution of the trust and the proceedings for the foreclosure of the mortgage and the execution sale thereunder were such as to make it a trustee of the title for the plaintiff ex maleficio. This position involves three substantial

contentions : First, that it was the duty of the Title Company to advance whatever money might be necessary, in addition to the income from the property, to pay the taxes and interest on the mortgage ; second, that it did not apply the whole of the net income to the payment of such interest and taxes, but wrongfully diverted a large amount thereof to the payment of itself for services rendered and interest on money advanced by it, and thereby suffered a default in the interest payments, in consequence of which the mortgagee declared the entire loan, both principal and interest, due 14 days before maturity, and commenced the foreclosure suit; and, third, that it induced and brought about the foreclosure suit for the purpose of acquiring the title to the property.

The question as to whether the Title Company was guilty of breaches of its duty prior to the foreclosure suit was tried out in the former litigation between the parties, and it was there held that the Title Company did not agree to advance money necessary to pay the interest on the mortgage and taxes, and that it had "not collected from said real property, held by it under said trust agreement, funds sufficient, when applied as stipulated by said agreement, to pay any part of the interest notes in the complaint mentioned, maturing on the 13th day of February, the 13th day of May, the 13th day of August, or the 13th day of November, 1900, nor had it misapplied or converted the same," but "had conducted and managed said trust carefully and honestly, and had punctiliously accounted for all sums collected and received by virtue thereof": *United States Mortg. Co.* v. *Marquam*, 41 Or. 403 (69 Pac. 37, 41). It would seem, therefore, that all such questions are concluded by the former litigation. But, however that may be, we have examined the present record with care, and are unable to find anything to substantiate the charges made. The claim that the Title Company agreed to make

advances to meet the interest payments on the mortgage and taxes is not borne out by the testimony, and is contrary to the terms of the written agreement between the parties.

8. The charge that the default in the payment of the interest on the mortgage and the consequent foreclosure thereof were due to the failure of the Title Company to apply the net income from the property to the payment of the interest as it matured is completely refuted by the fact that it appears from the tabulated statement of the income and the disbursements therefrom, appearing in the brief of counsel for respondent, that if the Title Company had applied the entire gross income from the property during the life of the mortgage, less the necessary operating and miscellaneous expenses, it would not have kept the interest paid. Indeed, there would have been an actual deficiency at the maturity of every one of the interest notes, except four. From the time the Title Company assumed control of the property until the maturity of the first interest note, the gross receipts were $8,809.15, operating and miscellaneous expenses, $4,355.78, leaving a net balance of $4,453.37, while the interest note was for $5,250; so there would have been a deficiency of $796.63. At the maturity of the second interest note, on a like basis, the deficiency was $644.20, and at the date of the third $1,-122.21. At the maturity of the fourth interest note there was a surplus of $1,676.86, but this was not sufficient to make up for the previous deficiencies. Thus we might go through the entire time covered by the life of the mortgage, with similar results. This calculation includes, among the receipts in January, 1899, an item for $5,000, deposited with the Title Company by the lessee of the Marquam theater as security for the performance of its contract, and for which plaintiff was not entitled to credit;

and it does not include the 3 per cent commission to the
Title Company for services in collecting the rents, etc.,
which it was clearly entitled under the contract to deduct
from the income before applying it to the payment of
interest. So there is no foundation for the claim made
by the plaintiff.

9. In addition to this the application of the income was
made by the Title Company, from time to time, with his
full knowledge and acquiescence. Itemized statements
of the receipts and disbursements were rendered to him
quarterly, from the 13th of February, 1895, to the 13th of
June, 1899. In several instances he gave his note for the
balance shown to be due by these statements, and in others
retained them without objection. The parties have there-
fore given to the contract by their conduct a practical con-
struction, which, even if doubtful, the plaintiff is not now
in a position to question.

10. The claim that the foreclosure suit was commenced
by the Mortgage Company, at the instigation and request
of the Title Company, with the design of securing the
property, is contradicted by the testimony of the officers
of both companies and the circumstances of the case. On
the contrary, the evidence shows that the Title Company
used every reasonable effort within its power, short of
increasing its own indebtedness against the plaintiff, to
obviate the necessity of a foreclosure. Mr. Young, the
president of the Mortgage Company, testified that he had
had several conversations with Mr. Ross, the manager of
the Title Company, in which he (Ross) endeavored to
obtain a reduction of the interest on the loan, or some
adjustment which would avoid a foreclosure, and made
various suggestions looking to that end ; that at Ross's
request the commencement of the suit was postponed on
account of the hopes held out that the plaintiff would be
able to procure a new loan, and the foreclosure thereby

be rendered unnecessary; that prior to commencing the suit Ross frequently urged the Mortgage Company to refund the loan at a lower rate of interest, or extend the time for the payment thereof. Mr. Hurd, the assistant secretary of the Mortgage Company, testified substantially the same. He says:

"I recall that the default of Marquam in the payment of his interest was frequently discussed between us, and Mr. Ross made various suggestions looking to the adjustment of the matter in such a way as to preclude the necessity of the foreclosure of our mortgage. Mr. Ross was very desirous to avoid a foreclosure of the mortgage, and was very anxious to see foreclosure proceedings postponed as long as possible, in case they should become necessary."

And, again:

"The foreclosure suit was deferred, in reliance on a statement of The Title Guarantee & Trust Co. that the rents were increasing, and in the hope that funds could be secured by P. A. Marquam for the replacing of his loan, thus rendering the foreclosure on our part unnecessary. * * Mr. Ross, on different occasions prior to the foreclosure, took up with me the question of extending this loan at a lower rate of interest for the benefit of P. A. Marquam, but we at no time felt justified in acceding to his request."

Mr. Ross says that he made several attempts to refund the loan, and applied to life insurance companies, trust companies, and other financial institutions for money for that purpose, but was unable to effect his object.

There is no testimony in the record showing or tending to show that the Title Company was anxious or solicitous to have the mortgage foreclosed. Indeed, the action and conduct of its officers indicate a contrary purpose. The plaintiff was indebted to it in the sum of about $40,000. The only security was a lien upon the property, subject to a prior mortgage of $300,000 and interest, due the Mortgage Company. The Title Company knew that, if this

mortgage was forclosed, it could probably protect its own interest only by purchasing at the foreclosure sale and taking care of the first mortgage. This was a condition it evidently hoped to avert, and for that purpose its manager seems to have exercised all the diligence within his power, but without avail. Much stress is laid upon the fact that after the Mortgage Company had determined to proceed with the foreclosure suit Mr. Ross was first employed as its attorney, although he subsequently retired, and the suit was actually brought and conducted by another. We are not able to give this circumstance the force and effect claimed for it by the plaintiff. There was necessarily no conflict in the interests of the Mortgage Company and the Title Company in the foreclosure proceedings. The mortgage was admittedly a first lien upon the property, and it was therefore but natural for the Title Company to endeavor to make the expenses of the foreclosure as light as possible, as it could only protect itself by paying or taking care of the first lien and accruing costs. Nor was there any fraud in the agreement made by it with the Mortgage Company, under which Ross purchased at the sale under the decree of foreclosure, concerning the manner of payment of the amount due under the decree. That was a matter wholly between them, and not one which the Title Company was bound to disclose to the plaintiff. The duties as trustee ceased with the foreclosure, and thereafter it stood in the same position as any other junior mortgagee in possession whose mortgage has been foreclosed, and was entitled and had a right to make any satisfactory arrangements with the prior mortgagee by which its own interests could be subserved and protected. It may be said in this connection, however, that Marquam was advised by the officers of the Title Company several days before the sale that arrangements could probably be made to carry a purchaser of the property for $300,000,

and that, if he could secure some one to pay the balance, they would coöperate with him to the fullest extent, if desired, in securing a loan for that amount from the Mortgage Company; but he was unwilling or unable to do so.

Without further extending this opinion, it is enough to say that after a careful and exhaustive examination of the record and argument we are all in full accord with the trial judge as to the facts, but are unable to agree with him in his construction of the contract between the plaintiff and the Title Company. As a consequence, the decree of the court below must be reversed.    REVERSED.

---

Decided 17 July, 1906.

ON MOTION FOR REHEARING.

MR. JUSTICE HAILEY delivered the opinion of the court.

The petition for rehearing in this case was filed February 28, 1906. We have carefully considered the questions therein presented, and in so doing have reviewed the entire record in the case. The only question raised in the petition for rehearing that is not fully discussed in the opinion heretofore rendered is that of the effect of the supplemental agreement of November 27, 1896, between the plaintiff, Marquam, and his wife, the Title Company, and the Northern Counties Investment Trust, Limited. The plaintiff contends that this supplemental agreement explains more fully the purposes of the other agreements and confers a power of sale upon the Title Company by the following language used therein :

"It is stipulated that the properties mentioned in the said trust agreements and hereinafter described, and the proceeds which may arise from them, either from rents, issues and profits or from sales, shall be held by said Title Guarantee & Trust Company, under said existing trust agreements and hereunder until such time as that the

indebtedness due upon the judgment hereinbefore mentioned, together with the legal interest thereon, shall be fully paid and satisfied, or until the trust fund and trust properties by The Title Guarantee & Trust Company held under the said trust agreements shall become exhausted; but this agreement shall not be construed as impairing the priorities already created by the said several trust agreements above-mentioned, including any past or future advances made according to their terms, or entitle the Northern Counties Investment Trust, Limited, to any payments from the trust fund on account of said indebtedness due it, until all of the rights or interests in any of the said properties, and the trusts created therein in any of the parties mentioned in the said trust papers are fully satisfied, in accordance with the said trust papers, save and excepting the interests and rights therein of P. A. Marquam and Emma Marquam, or either of them, but as to them the right is now created and intended to be conferred on the Northern Counties Investment Trust, Limited, as a beneficiary of the trust fund and estate in the hands of the said The Title Guarantee & Trust Company, shall be deemed prior to any interest or right therein of the said P. A. and Emma Marquam, whom it is intended by this agreement to postpone to the interest in the said properties in the Northern Counties Investment Trust, Limited."

11. There is nothing in the supplemental agreement that attempts to change the character of the prior agreements; but, on the contrary, it declares that "this agreement shall not be construed as impairing the priorities already created by the said several trust agreements above mentioned." The purpose of this agreement was to postpone the rights of Marquam and wife under the former agreements recited in the opinion to the rights given by this agreement to the investment company, which had a judgment against Marquam for $6,746.57, dated August 25, 1895. It simply added the claim of the investment company to the claims already secured by the former agreements, and postponed all rights of Marquam and wife in

the property mortgaged to the claim of the investment company, which was given the priority over Marquam and wife, but did not alter or change the character of the existing agreements between the parties whose claims were secured by the property held by the Title Company. The utmost that could be claimed for it is that it conferred a power of sale upon the Title Company; but such sale under our statute could only be made under a decree of foreclosure as provided in Section 423, B. & C. Comp: *Thompson* v. *Marshall*, 21 Or. 171, 178 (27 Pac. 957).

12. Such a power of sale could not alter the character of the agreements between the parties, so long as the object was to secure the payment of debts due the parties mentioned in the several agreements. The object of the original agreements was to secure the payment of certain debts therein specified, and the supplemental agreement merely confirmed these prior agreements and the rights of the several parties thereunder, and gave a priority to the investment company to the amount of its claim over the rights of Marquam and wife, who were to have all the property covered by the deed to the Title Company reconveyed, so that Marquam should be repossessed of the fee thereof and his wife reinstated as to her dower therein when the several claims of the other parties had been paid. The supplemental agreement is in effect a junior mortgage from Marquam and wife in favor of the investment company, and in no wise affected the terms of the other agreements or the mortgage given to the United States Mortgage Company, by which the sale of the property was made under a decree of foreclosure.

After full consideration of the case we are all agreed that the former opinion was correct, and the petition for rehearing will therefore be denied.

REVERSED: REHEARING DENIED.