Argued November 13; reversed December 10, 1940; rehearing
denied February 11, 1941

# HORNER *v.* PLEASANT CREEK MINING
# CORPORATION ET AL.
(107 P. (2d) 985, 109 P. (2d) 1044)

*J. Gordon Gose*, of Seattle, Washington, and *Samuel M. Bowe*, of Grants Pass (McMicken, Rupp &

Schweppe, of Seatle, Washington, and Niel R. Allen, of Grants Pass, on the brief), for appellants.

*A. E. Reames*, of Medford, for respondent.

KELLY, J. The gravamen of plaintiff's case being his charge of fraudulent, coercive and oppressive con-

duct on the part of the individual defendants disclosing the existence of a conspiracy to deprive plaintiff of the repayment of money advanced to said corporation and to render his interest in said corporation valueless, it becomes necessary to analyze the facts which have been presented as a basis of plaintiff's charge.

The purpose for which defendant corporation was organized is to conduct mining operations on Pleasant creek in Jackson county, Oregon, upon premises to which plaintiff, the defendants, E. B. Hanley, Sr., and Joe E. Most, and a gentleman, who is not a party hereto, namely, Mr. T. M. Gerety had theretofore secured title.

The first incident we need to note is an agreement evidenced by a writing executed on January 26, 1938, by plaintiff, the individual defendants and Mr. Gerety. Therein defendants Hanley and J. E. Most are known as first parties and plaintiff and Gerety as second parties. We quote from the body of said written memorandum:

"Whereas, the First Parties have procured from James Bruce Murray an Option to purchase all of his mining rights and contracts on property situate on Pleasant Creek, in Jackson County, Oregon; and

Whereas, the Parties hereto desire to acquire and mine said property;

Now, Therefore, It is hereby mutually agreed between the Parties hereto as follows:

That the Parties hereto will either enter into a Partnership for the purpose of mining said property, or will organize a Corporation for said purpose; and that the First Parties shall each own a one-third of said Partnership or Corporation, and the Second Parties will own the remaining one-third thereof;

And it is further agreed that the necessary moneys to be expended in the acquisition of said properties,

and the mining thereof, shall be paid a one-third thereof by each of the First Parties, and the remaining one-third thereof by the Second Parties.

It is further understood and agreed between the Second Parties that out of the 33 1/3% interest that the Second Parties shall acquire in said Partnership or corporation, 15% of the whole of said Partnership or Corporation shall be the property of T. M. Gerety, and 18 1/3% of the whole of said Partnership or Corporation shall be the property of W. H. Horner."

A partnership was not formed, but a corporation was organized. Plaintiff suggests that this may have been accomplished in order to place the minority stockholders, plaintiff and Gerety, at a disadvantage with respect to the management of the joint enterprise.

The corporation that was organized has an authorized capital of $500 divided into 500 shares of common stock of the par value of $1 each, which stock is owned as follows:

Defendant J. E. Most, 181¼ shares; defendant, E. B. Hanley, Sr., 181¼ shares; plaintiff W. H. Horner, 100 shares and T. M. Gerety, 37½ shares.

The articles of incorporation were filed on January 12, 1939, with the Secretary of State of the State of Washington. It will be noted that this is almost a year subsequent to the date of the execution of the agreement above set out. The first meeting of the board of directors of said corporation was held on the 20th day of January, 1939. Defendant E. B. Hanley was president and plaintiff W. H. Horner secretary thereof. The other member of the board of directors was defendant J. E. Most.

On February 1, 1939, a special meeting of the board of directors of said defendant corporation was held at which the purchase was authorized of the mining

property and equipment, constituting the initial outlay of said corporation, for the aggregate sum of $103,-057.74. The value of the respective interests of the stockholders, respectively, from whom said property was thus acquired by said corporation, was as follows:

| | |
|---|---|
| E. B. Hanley | $39,717.90 |
| J. E. Most | 35,000.00 |
| W. H. Horner | 20,652.34 |
| T. M. Gerety | 7,687.50 |

Written evidence of indebtedness was executed and delivered by said corporation to each of the foregoing parties respectively in the respective amounts above set out, which written evidence in each instance set forth the same terms and conditions as outlined in the statement of facts concerning the one issued to plaintiff.

Plaintiff alleges, in effect, that these conditions indicate a purpose to oppress plaintiff by placing him at the mercy of the majority stockholders and directors.

We quote from plaintiff's amended complaint:

"The plaintiff further alleges that in the construction of said corporation and in the issuance of the company's notes for such advances, the said defendants Hanley and the said Most had the fraudulent intention of cheating and wronging this plaintiff out of the money evidenced by said notes, and so constructed said corporate action as to place the entire matter of the payment of said notes within their hands, intending during all of said time only to operate said property long enough to verify its values and then to abandon said operations until such time as they, in the carrying out of their said fraudulent intention, could wipe out the notes to said Gerety and to this plaintiff, and all their stock in said corporation for little or no consideration."

Defendants Hanley and J. E. Most secured the tractor used in the mining operations of the corporate defendant. It was a used tractor. On August 22, 1939, mining operations ceased because of the condition of said tractor. It is charged by plaintiff that defendants Hanley and J. E. Most acquired a secondhand tractor so wornout as not to be capable of being used throughout the mining season without expensive repairs or renewals. It is also charged by plaintiff that Hanley and Most intended not to repair said tractor or acquire a new one until they had carried out their fraudulent intent and purpose.

When the original complaint herein was filed on the 30th day of June, 1939, a temporary restraining order was issued.

We quote the first paragraph thereof:

"It is hereby ordered that until the further order of this Court, the defendants and each and all thereof desist from shutting down, except for clean-up purposes, the mining operations of the Pleasant Creek Mining Corporation at its dredge and plant in Sections 27 and 28, Township 34 South of Range 4 West of Willamette Meridian, and from discharging any of the employees thereof, and from dismantling any of the machinery thereof, and from shutting down and discontinuing said mining company's mine operations following the said clean-up; also from carrying out or attempting to carry out any of the provisions of the trust agreement, Exhibit 'C' to the plaintiff's complaint, reference to which is hereby made, and the same is made a part hereof."

In answer to the question, why they had not repaired said tractor, defendants suggested that, because they were thus restrained from dismantling any of the machinery an adequate repair of the tractor would necessitate its dismantlement, defendants could not

make such repair without violating the court's order. Moreover, there is some testimony in the record to the effect that the tractor is yet in operating condition.

The trust agreement, to which reference is made in the restraining order above quoted, is one executed on or about the 4th day of May, 1939, by E. B. Hanley and E. G. Most as first parties and J. E. Most as trustee, whereby the right to vote the stock of the first parties was transferred and assigned to J. E. Most.

In order to enable E. G. Most, who is a brother of J. E. Most, to join with Hanley in executing said trust agreement, J. E. Most transferred one share of stock to E. G. Most.

It is charged by plaintiff that the execution of the voting trust agreement was in pursuance of the alleged design and conspiracy of E. B. Hanley and J. E. Most.

The parties to this trust agreement were temporarily enjoined from carrying out its provisions by an order of the Superior Court of the State of Washington in a suit instituted by the wife of defendant Hanley on or about June 2, 1939, wherein the plaintiff charges that said Hanley is incompetent and the victim of undue influence on the part of J. E. Most. Shortly after the institution of the suit to restrain him from carrying out the provisions of said trust agreement, defendant J. E. Most went to Alaska.

Plaintiff alleges that the manner in which the certificates of stock were issued in lieu of those surrendered in order to effectuate the execution of said trust agreement was in violation of the statute of the state of Washington in that the word ''secretary'' was scratched off where the plaintiff as secretary should have signed, and the name of the vice-president was

inserted, the vice-president being J. E. Most, to whom, in fact, the trustee certificate was so issued.

Plaintiff also alleges that the stock books were not in the possession of the said defendants; the transactions were not in the office of said defendant, but in the private office of the said E. B. Hanley and E. G. Most; that said transactions were kept secret, were unknown to those in charge of the company's office in said city of Seattle where said transactions were had; "and having effectuated said fraudulent transfer and pretended to so create said voting trust for the control for a period of ten years of said corporation, the said defendant Joe E. Most hurriedly departed for Alaska, leaving the defendant E. B. Hanley to, under his direction, shut down said mining operations in the June 30th clean-up. And it was the intention of said defendants so conspiring and acting fraudulently together, to cause the plaintiff to believe that the said mining company was to become insolvent so that they might appropriate to their own fraudulent purposes and uses the interest which the plaintiff had in said corporation and in the note owned by it to him. And to that end they planned to cause this plaintiff to believe, and the said Gerety to believe, that said mine would be shut down, great and unnecessary expenses were to be incurred, and that the corporation should be handled by the said J. E. Most in such a fraudulent, arbitrary manner as to render it no longer a going concern, but an insolvent one. By such method the said conspiring defendants intended to use and exert the influence and power of said corporation as the owner and proprietor of said property for the purpose of oppressing and injuring the said minority stockholders of whom this plaintiff is one."

As we read the record, plaintiff seeks to support the foregoing allegations by the course above outlined and by incidents which we will designate as the McCullough telegrams; the Most-Hanley letter; the comment of Hanley while considering a number of bills against the corporation; the trommel flume proposition; the discharge of plaintiff as secretary of the corporation; and a telegram from Most to Hanley suggesting that a large bond be demanded of plaintiff.

On May 17, 1939, Miss Marcella McCullough of Medford, Oregon, telegraphed a night letter to defendant J. E. Most at Nellie Juan, Alaska, as follows:

"Grisleys and T's 27% for sale at cost John Engf Seattle prospective buyer Possible I can take deal advise"

[The record discloses that Grisley meant Horner; that T meant Gerety and that Engf meant Emel.]

On May 18, 1939, Mr. J. E. Most, defendant herein, wired to Miss McCullough by night letter the following answer:

"I have wired Mr. Hanley you would get in touch with him stop He has been down there and may have more information than I Would suggest that you go Seattle see him stop Grisley may need money and is pulling fast one you should be very careful him stop Maybe you and Mr. Hanley can get deal for about fifteen thousand cash"

On the same day that he sent the above night letter to Miss McCullough, namely, May 18, 1939, defendant J. E. Most at Nellie Juan, Alaska, sent the following telegraphic night letter to defendant E. B. Hanley, 530 Colman building, Seattle, Washington:

"Received following wire from Marcella McCullough at Medford quote Horner and Tom's twentyseven

percent for sale at cost John Emel Seattle prospective buyer Possibly I can take deal advise end quote I am wiring her get in touch with you stop This may be play on their part stop See Emel and ask him if he is messing in that deal stop They may be broke on account other property You should have late information on that Maybe you can make deal through Marcella Get rest property for fifteen thousand wire me what you do stop Ship twelve bars three sixteenth by four flat iron twelve bars three quarter inch half round iron twelve spark plugs eighteen milimeter hot plugs What did you do with Murray on Williams property.''

Concerning her telegram, Miss McCullough made an affidavit, which is a part of the record before us in which she says in effect that on or about May 12, 1939, at the dredge, Gerety informed her that the stock owned by plaintiff and representing 20 per cent of the total authorized issue could be purchased for $15,000; that a few days later, toward the middle of May, 1939, upon again meeting Gerety, he stated to her that he too desired to dispose of his stock, which amounted to 7½ per cent of the authorized outstanding issue, for $3,000; that this caused her to wire Most for a report as to the value of the stock so offered and whether there would be any objection to her becoming thus associated with the corporation; that she was and is amply financed to handle such a transaction; that she acted entirely in her own interest and that she was not directly or indirectly employed by Most and Hanley to secure the Horner stock in their interest and behalf.

Gerety denies that he told Miss McCullough that Horner would sell his stock for $15,000.

In a letter contained in an envelope postmarked at Juneau, Alaska, June 5, 1939, written on stationery of the Alaska Steamship Company on board S. S. Alaska,

694

defendant J. E. Most wrote to defendant Hanley as follows:

"I think just for effect it would be a good thing when you go to Medford to close the mine down if you would indicate to Jack that you think that you and I should go on a good Salery this fall when we start up. I think that would salt him for awhile."

Both Hanley and Most testified that the above suggestion was entirely disregarded by them. Most said that he was angry because he had been recently served with a copy of the charges made by Mrs. Hanley in the suit above mentioned and he thought that plaintiff had instigated that proceeding.

Plaintiff testified that about the 6th or 7th of June, 1939, he was in Mr. Hanley's office when some bills came in, one of which was in the sum of three hundred and some odd dollars for additional parts for the tractor, whereupon, Mr. Hanley said: "I am going to shut that damn thing down."

The trommel flume proposition has caused the major portion of the testimony herein to be given. It has provoked such extensive treatment in this record, measured by the number of folios of testimony compared with the testimony upon the other phases of this case, that it is not surprising that defendants contend that the only issue is whether the judgment of the court shall be substituted for that of the majority of the board of trustees in reference to the manner in which the mining operations of the corporate defendant shall be conducted. We realize that plaintiff's position is that the trommel flume proposition is really but an afterthought upon the part of the individual defendants and that the real issue for the court to determine is whether there was a course of conduct pursuant to a conspiracy on the

part of such defendants having for its purpose, and which, if not enjoined, will cause the loss by plaintiff of his interest in and claim against said corporate defendant.

The dredge in use since the defendant corporation began mining operations is a flume dredge.

Mr. T. M. Gerety, as a witness for plaintiff, gave a description of both types of dredges. We quote from his testimony:

Referring to a dredge of the B & H Company operating on Forest creek in Jackson county, Mr. Gerety was asked:

"Q. And what kind of dredge is that, as of the two types?

A. Well, that is what is usually called the bucket dredge. It has a trommel and stacker, a floating washing plant instead of the gravel being dug with an endless bucket line, which is dug with a separate power plant, that moves on a caterpillar track and known as drag line or power shovel with drag line, flume and bucket.

Q. What is the difference between the ordinary bucket dredge—that is a flume dredge and one with this trommel?

A. Well, the difference between the flume dredge and the bucket line dredge with trommel and stacker is just simply that you have a trommel which acts as a classifier and classifies out the larger material that is waste that goes out the stacker. Your fine material goes through a perforated screen, the trommel screen, and out on tables or on piles or some sort of arrangement for separating the gold from the fines. Your flume pushes—your material out of either the endless bucket line or being dug by power shovel, with drag line, pump and bucket, is diverted directly into the flume, all the material changed, and simply goes down the flume over a series of riffles."

On cross-examination Mr. Gerety was interrogated and testified further as follows:

"Q. Now, I listened to your explanation of the difference between a trommel and flume type of dredge and I thought it was very clear. I want to develop one or two additional things in connection with it. In the flume type of dredge, all the material that is put into the boat and dumped into the hopper or sump by the buckets, whether large or small, whether large rocks or small rocks, whether large gold or fine gold, all goes through that one flume—isn't that right?

A. Yes sir.

&ast;  &ast;  &ast;  &ast;  &ast;

Q. Now, in order to make it a little clearer in the record and for the Court and for my benefit, the trommel type of dredge—the trommel is a hood, revolving system isn't it?

A. Yes.

Q. And the bucket line dumps the material in such a way as to put it through the trommel?

A. Yes sir.

Q. Is that right?

A. It is.

Q. And you testified a few minutes ago the trommel is a screen with large holes isn't it? They may vary but they are large holes?

A. The holes vary usually from a quarter up; to - -

A. - - - - perhaps three-quarters of an inch.

Q. And the purpose of the trommel is to have a clean separation of the larger materials that are brought in by the bucket line from the finer materials and the finer materials drop through the holes in the trommel or screen on to the table below—isn't that right?

A. With the addition of the milling and washing and breaking up of the material where you have a clay substance that holds clay.

Q. That is right. The operation of the trommel has the additional effect of rolling around boulders, if there are any, so they are pretty well cleaned up and the

breaking up of the clay masses—the clay masses brought up by the bucket line—is that right?

A. Yes sir.

Q. Because if there are substances of clay masses here and they are coming over, which are not broken up, the clay blocks have a tendency to take the fine gold with them—isn't that true?

A. And coarse too.

   ❁   ❁   ❁   ❁   ❁

Q. As a matter of fact, in bucket line operations such as you have out there on that Pleasant Creek boat, when the clay is actually picked up by those buckets, it comes over in lump form and rolls over on there—isn't that true?

A. Yes.

Q. How big are those buckets?

A. Three cubic feet.

Q. Three cubic feet. The weight of one of those buckets full is quite considerable, isn't it?

A. Well,—

Q. It depends somewhat on the material put on the dredge?

A. The material runs about thirty hundred to a yard—so one-ninth of that would be about the weight.''

The testimony is conflicting upon the question whether in its operations ascending the grade upon which the dredge is now resting, it is necessary or even advisable to install a trommel and stacker.

Defendants insist that operating without such installation is attended by actual loss. Plaintiff contends that such installation would constitute a waste of the money required to make the initial installation and an attending 25 per cent annual depreciation each year of the original cost of that equipment in operating a trommel stacker dredge.

On January 20, 1940, the board of directors of defendant mining company adopted a resolution, plaintiff voting in the negative, as follows:

"Whereas; the Board is convinced that the present flume type dredge located on Pleasant Creek, Jackson County, Oregon, is inefficient in that a substantial amount of gold is lost or not recovered in the operation thereof; and it is the widely accepted opinion of experts, that gold recovery by a trommel type dredge is substantially higher than by a flume type dredge; and, that the conversion of the Company's said flume type dredge to a trommel type dredge is to the best interests of the Company and will substantially enhance its profits, and

Whereas; such conversion of the Company's present dredge to a trommel type dredge will cost in the neighborhood of $30,000.00, now, therefore, be it,

Resolved: That the officers of the Company be and they are hereby authorized to change the present dredge of the Company located on Pleasant Creek in Jackson County, Oregon, from a flume type dredge to a trommel type dredge, as soon as legally permissable and as soon as in their discretion they deem it proper, and to borrow money in the name of the Company to pay for the cost of converting said dredge to a trommel type dredge and to make any other financial arrangements by way of a mortgage or pledge of the Company's property necessary in their judgment and discretion, to provide moneys for converting the dredge to a trommel type dredge."

This resolution makes it clear that both Mr. Most and Mr. Hanley favor the installation of a trommel upon the dredge in question. Both of them testify they favor such installation. It is also apparent from the record that from $25,000 to $30,000 will be required in making such installation; but it is not clear that any disadvantage to plaintiff will ensue thereby.

As stated, defendants explained their failure to repair their tractor, after Mr. Gerety had discontinued its operation, as being due to the terms of the temporary restraining order of June 30, 1939; and their failure to resume mining operations as being due to the tractor's condition of disrepair.

We are unable to see any impropriety in Mr. Most's suggestion to Mr. Hanley to the effect that the attorney for them and the mining company be consulted about requiring a large bond from plaintiff in connection with the injunction plaintiff was seeking. A similar suggestion was made by the attorney for the plaintiff with reference to the defendants' application for an order by this court restraining plaintiff from applying for an execution upon the decree of the circuit court herein.

■■ In fact, we are of the opinion that plaintiff's showing herein upon his charge of fraud and conspiracy does not merit a finding or decree in his favor. It is unnecessary to repeat the well-known rule that fraud must be proven by clear and convincing testimony. From a consideration of the entire record, we conclude that plaintiff's testimony in that regard does not preponderate.

■ Both Mr. Hanley and Mr. Most testify unequivocally that it is their purpose to continue the mining operations upon their Pleasant Creek property with the view of realizing the amount invested therein from such mining operations. In the absence of a fraudulent or coercive design or purpose on the part of the management neither the judgment of the court nor that of a minority stockholder can properly be substituted for the judgment of the majority of the directors and stockholders of a corporation.

Taking the initial agreement of January 26, 1938, which, by its terms, provides that plaintiff and Gerety should have a one-third interest and comparing it with the distribution of the authorized capital stock made about one year later, we find that the course just proposed was not absolutely and exactly followed in that less than one-third interest was allocated to plaintiff and Gerety. We can find nothing whatever in this incident indicative of a fraudulent, unfair or oppressive purpose.

██ We find no support of the charge of fraud or unfairness in the organization of a corporation instead of the formation of a partnership. While it is true a minority stockholder does not have the same authority and control as that of a partner in the conduct of the affairs of the enterprise, it is equally true that the personal liability of a partner is coextensive with the amount of the partnership's valid indebtedness while the extent of the liability of a stockholder is controlled by the amount of stock held. After acting upon the board of directors as a member thereof from its organization to its last directors' meeting, the plaintiff is in no position to complain of the corporate structure he assisted in forming.

The issuance of the notes to the stockholders for their advances in the form above set out seems to be a substitution for the issuance of preferred stock. It does not partake of the nature of a fraudulent course. From the inception of the corporate operations until the 11th day of September, 1939, plaintiff was secretary of the corporation with authority to sign checks upon the corporate bank deposits and in possession of the corporate records. We are impressed with the fact that plaintiff's removal as secretary did not en-

sue until more than two months after he had instituted this litigation against, and secured a temporary restraining order directed to, the corporation and its majority stockholders. Neither the issuance of the written evidence of advances nor the removal of plaintiff as secretary of the corporation is to be considered as fraudulent under the circumstances disclosed by this record.

The disrepair of the tractor by reason of its use in six months of mining is no indication that it was selected by Most and Hanley with notice or knowledge on their part that it was not capable of being used throughout the mining season without expensive repairs or renewals.

In considering the failure of Most and Hanley to repair the tractor and other parts of the mining equipment, when Gerety discontinued mining operations, we cannot be blind to the fact that a restraining order had been issued without any notice to them. They had no voice in framing its terms. They were of the opinion that to continue operations as before it would be the cause of great loss to them. There is testimony in this record by disinterested experts in support of that view. Because of that fact, we are unwilling to hold that their failure to make the repairs and their failure to apply to the court to modify the language of the restraining order by permitting dismantlement for the purposes of such repairs constitute such fraudulent conduct as to justify the court in depriving them of the corporate management.

We find nothing in reference to the voting trust agreement that places plaintiff in any less favorable position than that which he occupied before such trust agreement was executed.

If it is a valid enforcible agreement, the plaintiff is no more and no less than a minority stockholder holding written evidence of advances, as stated, and a member of the mining company's board of directors. If the agreement is invalid, the plaintiff has just that status and no other. If the trust agreement had never been made, the same status would attend plaintiff.

We find nothing in Mr. Most's trip to Alaska, after the execution of the trust agreement, that affords ground for charging him or Mr. Hanley with acting fraudulently.

In reference to the McCullough telegram, the only direct testimony is that of Mr. Most, Miss McCullough, Mr. Gerety and plaintiff. It is true that Mr. Gerety and plaintiff contradict Miss McCullough as to the nature of their conversations with her; but as to her relation to Most and Hanley, there is no direct contradiction. There is no testimony that she was acting under their direction or as their agent or representative. In that state of the record, we are unable to say that such agency on her part as said defendants' representative has been established.

As to the Most-Hanley letter, it does not indicate that the mining operations were to be permanently discontinued. There is nothing else in the record indicating that Most and Hanley intended to provide salaries for themselves. There is a disclaimer from the witness stand of any such intention by each of said defendants. The record discloses that during the latter part of June, 1939, plaintiff conferred with the son of Mr. and Mrs. Hanley in the office of Mrs. Hanley's attorney in Seattle concerning the amount of money Mr. Hanley had invested in this Oregon enterprise. We think that Mr. Most acted upon surmise and sus-

picion in writing the letter and we are unwilling to approve it; but it does not prove a fraudulent design on his part as alleged by plaintiff.

The expression attributed to Mr. Hanley upon receiving certain bills against the mining company seems more like a petulant expression of displeasure than a statement of a deliberately formed intention to shut the mine down. In the light of Mr. Hanley's sworn declaration that he had and has no intention to discontinue the mining operations, we do not give that incident the effect of proving a fraudulent intention on Hanley's part to cease the mining operations.

As we understand the authorities relied upon by plaintiff to support his prayer for control of the corporate defendant by the court through injunction and receivership, such authorities are either based upon a holding that a corporate charter is a contract between the corporation and its stockholders, and between the stockholders severally, wherein it is agreed that the corporate property will be employed for a specific purpose, which purpose is being fraudulently frustrated; and hence the contract is being violated; or such authorities are based upon the rule of law that the directors are trustees of the corporation and for the stockholders; and the alleged fact that the directors are violating the terms of their trusteeship. We are unable to concur with plaintiff that in the instant case it has been proven either that the individual defendants have breached the corporate contract or violated the terms of their trust. For that reason we deem the authorities cited to that point by plaintiff as inapplicable.

■ The question is presented herein as to the propriety of an Oregon court assuming jurisdiction of this

cause instituted by a resident of Washington against a Washington corporation and individual defendants who are all residents of Washington. We think that the action of the learned trial court in that particular would not be ground for reversal. No. good purpose can be served by discussing the law upon that phase of the case further than to say that the assumption of jurisdiction in such a case as this is a matter within the sound judicial discretion of the trial court; and when such discretion has not been abused, the action of the trial court does not afford ground for reversal.

The decree of the circuit court is reversed, the injunction issued herein is dissolved, and this suit is dismissed.

BEAN, J., not sitting.

———————

Petition for rehearing denied February 11, 1941

ON PETITION FOR REHEARING
(109 P. (2d) 1044)

KELLY, C. J. Extensive assignments of error are contained in a petition by plaintiff for a rehearing. With two exceptions the same matter, which is contained in this petition, was presented upon the hearing of the case. These two exceptions refer to the affidavits of Marcella McCullough and a reference by the writer hereof to one of such affidavits in the opinion of the court; and to a petition of defendant, Hanley, to withdraw from this proceeding on appeal herein.

■ In plaintiff's petition for rehearing, attention is called to the fact that the McCullough affidavits were not received in evidence when this case was heard on the merits in the circuit court. The record of the trial of this case upon the merits was made up in part by

the introduction of all the oral testimony given upon an application for the appointment of a receiver. When that application was heard, the two affidavits made by Miss McCullough were introduced by defendants, received in evidence and marked exhibits G and H.

Immediately upon their introduction, plaintiff called T. M. Gerety to the witness stand and the following questions were propounded to Mr. Gerety and the following answers made by him.

"Questions by Mr. A. E. Reames:

Q. Mr. Gerety, I have before me the affidavit of Marcella McCullough, to the effect that about the 12th of May, '39, she talked with you and you informed her that the stock owned by the plaintiff Horner in the corporation, representing twenty per cent of the total authorized issue, could be purchased for Fifteen Thousand ($15,000.00) Dollars. I will ask you whether or not you stated that to her or words to that effect?
A. No, I didn't.

Q. It is also alleged in this affidavit that a few days later and toward the middle of May, 1939, you discussed with her the subject and said that you likewise desired to dispose of your stock in the corporation, which was seven and one-half per cent of the authorized stock outstanding for the sum of Three Thousand ($3,000.00) Dollars.
A. No, I said Ten Thousand.

Q. That about the first day of—There is no reference to a conversation in here with Mr. Horner. There is another affidavit made by the same party and on the same day—the 21st day of November, in which Miss Marcella McCullough says that in the latter days of June in '39 she, in company with her sister, had a conversation with you and that you were at that time acting as dredge master on the dredge. Did you act as dredge master?
A. I was superintendent.

Q. Were you ever dredge master?

A. No.

Q. And that inasmuch as she was contemplating the purchase of stock in the company she was naturally interested in its recoveries and so forth. These matters were discussed on said occasion with the said Garrity who stated, in substance and effect, that the operations were losing from 5 to 10 cents per cubic yard of the fine gold because they were not equipped with a trommel; and that I thereupon inquired of the said Garrity if it would not be advisable to install a trommel which it was suggested would cost approximately $20,000, to which suggestion he responded in substance and effect that the company was operating at a profit at that time and there would be no occasion to lay out this additional sum of money for a saving of 5 and 10 cents per yard in fine gold. Did you have any such conversation?

A. I remember having a conversation with her and her sister. I don't remember saying the average loss was about two cents a cubic yard.

Q. Is that what you thought it to be?

A. That was estimating what I thought would be the average loss in tailings.

Q. (Reading from Ex. 'G':)

'He also stated in substance and effect that the water available for these operations was at that time so heavily impregnated with silts and slime from the operation that it should not be continued beyond about the 1st of July; that even at the time the water was too thick with silts to accomplish an efficient recovery or to justify continued operations, but that it should be shut down until clearer water was available.'

Q. Did you have that conversation with her?

A. No, I never put any definite date when the water would run out, because I didn't know.

Q. How about the water being too thick to make an efficient recovery? Did you tell her that?

A. No.''

To the extent shown by the above quoted questions and answers the contents of the affidavits of Miss McCullough are in the record. Correction is therefore made in the writer's opinion herein by deleting from his statement of the contents of said affidavits the following phrases:

"that this caused her to wire Most for a report as to the value of the stock so offered and whether there would be any objection to her becoming thus associated with the corporation; that she was and is amply financed to handle such a transaction; that she acted entirely in her own interest and that she was not directly or indirectly employed by Most and Hanley to secure the Horner stock in their interest and behalf."

This deletion does not affect the conclusion given in the original opinion that such a fraudulent conspiracy as to warrant the interposition of the court in the management and control of the corporation defendant has not been shown to have been entered into by defendants Hanley and Most.

■ On the 20th day of January, 1941, defendant E. B. Hanley, Sr. filed herein a petition to dismiss his appeal. This petition is accompanied by the following affidavit: (Omitting the title of the case.)

"State of Washington ⎱ ss
County of King ⎰

E. B. Hanley, Sr., being first duly sworn on oath deposes and says: That subsequent to the argument of this cause and the submission thereof by counsel he has learned of the hostile and incompatible conduct as a trustee of Joe E. Most, one of the other appellants in this cause, and that the said voting trust agreement, one of the issues in the cause, was secured by the said Most from affiant for his own private gain and not for the welfare of this affiant or his family, and affiant does not wish to further be associated with the said

Most in prosecuting this appeal and desires to withdraw forthwith so that he may be free to take whatever future action he may deem for his best interests. Any requests or action on his behalf by his former attorneys are hereby withdrawn.

E. B. Hanley Sr.

The foregoing affidavit was carefully read to the said E. B. Hanley Sr. and he subscribed the same and swore on oath that the same was true on this 17th day of January, 1941.

V. N. Wohlgenant
Notary Public in and for
the State of Washington,
residing at Seattle.

(Seal)

My Commission Expires
May 4, 1943."

We are aware of the rule that in a case of joint appeal, any of several parties, who have instituted the proceeding, acting seasonably, may dismiss as to themselves and leave the remaining appellants to prosecute the appeal; but we think that this right to dismiss an appeal should not be extended beyond the period prescribed by statute as follows:

"At any time before the hearing or trial, the court, on motion of the appellant, may dismiss the appeal." Section 10-809, Vol. 2, p. 249, O. C. L. A.

The motion of plaintiff for a rehearing is denied.

The petition of defendant, Hanley, to dismiss the appeal as to him, is also denied without prejudice, however, to the future institution and prosecution of any appropriate suit, action or proceeding to test the validity of the voting trust agreement mentioned in the foregoing affidavit of said defendant Hanley.

BAILEY and LUSK, JJ., concur in result.

BEAN, J., not sitting.