Argued October 21, 1942; reversed January 5, 1943

LYON *v.* MAZERIS ET AL.

(132 P. (2d) 982)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*S. J. Bischoff,* of Portland (Pat H. Donegan, of Burns, on the brief), for appellants.

*Herbert P. Welch,* of Lakeview, and *Leonard H. Waterman,* of Burns (Herbert P. Welch, of Lakeview, and Biggs & Waterman, of Burns, on the brief), for respondent.

BAILEY, C. J. The plaintiff, John L. Lyon, instituted this suit against Gene Mazeris, Underbit Sheep Corporation, Emigrant Creek Land Company, a corporation, and others as defendants, for the purpose of having the plaintiff declared owner of certain personal property, consisting of sheep, other livestock and camp equipment, described in the complaint, and two tracts of land in Harney county comprising 1,680 acres, and for an accounting by the defendants. From a decree of the circuit court declaring that at the time

of the execution sale hereinafter to be particularly described the personal property in suit was in the possession of and held by the defendant Mazeris as trustee for the plaintiff and that the title to the real property involved was held by Emigrant Creek Land Company as trustee for the plaintiff, and requiring an accounting by them and other defendants, the above named defendants have appealed.

The order appealed from is designated as an interlocutory decree. It requires the defendant Emigrant Creek Land Company to deliver to the plaintiff within fifteen days from the date of the decree a deed for all the real property involved in the litigation and further provides that in the event of the failure of that company to comply therewith, the decree "shall stand as and for a deed to said real property to plaintiff". It further requires the defendants, without naming them but apparently referring to Mazeris, to deliver to the plaintiff possession of all the personal property "upon release of jurisdiction of said property from the circuit court of Lake county, subject to the lien, if any, of" the defendant Mazeris. The determination of costs was reserved until final decree.

The first question to be decided is whether the decree from which the appeal was taken was an appealable order. That question is not raised by the litigants but was suggested from the bench during the oral argument in this court, because of the seeming conflict between the decisions in *Froman v. Jones*, 141 Or. 42, 16 P. (2d) 21, and *Marquam v. Ross*, 47 Or. 374, 78 P. 698, 83 P. 852, 86 P. 1, in both of which an accounting was involved. In each case an appeal was taken after an accounting was ordered and before the final determination of what the settlement should be. In *Marquam v. Ross* this court held that the order ap-

pealed from was final, whereas in *Froman v. Jones* it was held that the order attempted to be appealed from was interlocutory and therefore not appealable. At the court's request, this matter has been briefed by counsel in the case at bar.

The facts involved in *Marquam v. Ross,* supra, were briefly the following: Marquam executed a mortgage on real property to United States Mortgage & Trust Co. Later the mortgage was foreclosed, the property was sold and the sale was confirmed. Suit was then instituted to redeem the premises from the foreclosure sale on the ground that "the purchaser was plaintiff's trustee, who had unlawfully caused the sheriff's deed therefor to be executed to the Oregon Company, a corporation," which was alleged to be not an innocent purchaser. It was further alleged that the plaintiff's trustee and the Oregon Company had been in possession of, and collecting rents from, the mortgaged property. In the prayer the plaintiff asked that the purchaser at the sale and the corporations represented by him be declared plaintiff's trustees; that the plaintiff be permitted to redeem the property from the sale; and that the defendants be required to render an accounting of the rents and profits received by them from the property after the sale thereof on execution.

The trial court therein decreed that the purchaser (Ross) at the foreclosure sale was the plaintiff's trustee; that the Oregon Company, which acquired title by sheriff's deed, was not an innocent purchaser; that the plaintiff be permitted to redeem the property; and that an accounting be rendered by the defendants, to determine the amount that the plaintiff should be required to pay for redemption. From that decree and

prior to an accounting the defendants appealed to this court.

The plaintiff, Marquam, interposed a motion to dismiss the appeal, contending that the order sought to be reviewed was merely interlocutory and that no final decree could be entered from which an appeal could be taken, until after the accounting was had. In answer to the plaintiff's contention, the defendants' counsel argued that the right to redeem was the primary issue involved, and that the determination of that issue "in plaintiff's favor, necessarily carried with it, as an incident thereto, the recovery of the rents and profits accruing since the sale, less certain credits, and, the court having adjudged that defendants should pay the costs and disbursements incurred, the decree is susceptible of immediate execution, thereby precluding further inquiry, except such as is necessary to carry it into effect, and hence it is final and appealable."

The statute then in effect relating to appeals, § 547, B. & C., provided as follows:

> "An order affecting a substantial right, and which in effect determines the action or suit so as to prevent a judgment or decree therein, or a final order affecting a substantial right, and made in a proceeding after judgment or decree, for the purpose of being reviewed, shall be deemed a judgment or decree."

After reviewing many of the previous decisions of this court concerning what constituted a final order from which an appeal could be taken, and numerous cases from other jurisdictions, the court adopted the defendants' theory as hereinabove quoted, and held that the primary issue involved in the litigation was the plaintiff's right to redeem and that inasmuch as

the decree determined the rights of the parties it was susceptible of immediate enforcement and was therefore appealable although it left for later determination the amount that the plaintiff would be required to pay to redeem. The conclusion of the court is thus expressed:

"In the case at bar, the issue involved is the right to redeem, and, this having been adjudged in plaintiff's favor, and the property affected thereby particularly described, the sum to be paid therefor specified, and the costs and disbursements taxed to the defendants, the decree, in our opinion, 'determines the rights of the parties,' is susceptible of immediate enforcement by tendering to the clerk of the court the sums prescribed, with interest, less, $3,000 a month, alleged to have been received as rent, leaving the remainder to be paid on confirmation of the referee's report; and is therefore final and appealable."

*Marquam v. Ross,* supra, has never been expressly overruled. It has been cited with approval in a number of instances, as for example: *Sears v. Dunbar,* 50 Or. 36, 41, 91 P. 145; *Giant Powder Co. v. Oregon Western Ry. Co.,* 54 Or. 325, 326, 101 P. 209, 103 P. 501; *Columbia City Land Co. v. Ruhl,* 70 Or. 246, 249, 134 P. 1035, 141 P. 208; *Salem King's Products Co. v. LaFollette,* 100 Or. 11, 196 P. 416; *Winters v. Grimes,* 124 Or. 214, 217, 264 P. 359; *Timoney v. McIntire,* 146 Or. 583, 586, 31 P. (2d) 165. Not in any of the foregoing cases, however, were the facts similar to those in *Marquam v. Ross,* supra, or in the case at bar, with the exception that *Winters v. Grimes,* supra, involved an accounting. That case will later be discussed in detail.

In *Froman v. Jones,* supra, suit was brought to have the defendant James Jones declared trustee *ex maleficio* of a part of the estate of William Jones,

deceased, which property, it was alleged, James Jones had agreed to hold in trust for Forrest Jones. The decree appealed from declared James Jones both individually and as the executor of the will of William Jones, deceased, to be the trustee for the use and benefit of the estate of Forrest Jones, then deceased, of one half interest in all the residuary estate of William Jones, deceased, and required James Jones to render an accounting to the administrator of the estate of Forrest Jones, deceased. From that decree, and prior to an accounting, James Jones individually and as executor attempted to prosecute an appeal.

This court held that the order appealed from was interlocutory, as it did not determine "the suit so as to prevent a decree therein", although the order did affect "a substantial right of the defendant". Section 7-501, Oregon Code 1930 (now § 10-801, O. C. L. A.), was quoted, and it was held that the statute authorized an appeal from an interlocutory decree only in a suit for the partition of real property, and that, applying the rule *inclusio unius est exclusio alterius,* no other interlocutory decree was appealable. Reference was then made to *Winters v. Grimes,* supra, and it was held that that case was determinative of the question and that no appeal would lie. In regard to *Winters v. Grimes,* supra, and *Marquam v. Ross,* supra, the court said:

> "Counsel for appellant cites and relies upon Marquam v. Ross, . . . That case was cited in the case of Winters v. Grimes, *supra,* and it was not considered to be in conflict with the ruling in the latter case. After a careful examination of the opinion in Marquam v. Ross, we see no conflict between the final determination in that case and in the enunciation in Winters v. Grimes, *supra.*"

The decree in *Froman v. Jones,* supra, did not describe or specify the trust property otherwise than as a half interest in the residuary estate of William Jones, deceased. It did not order that the trustee convey any real property or provide that on his failure so to do, the decree should stand in lieu of a conveyance. Nor did it require the trustee to deliver any personal property to the administrator of the estate of Forrest Jones, deceased. In fact, the property to which that estate was entitled and the amount thereof could not be determined until after an accounting was had.

The case of *Winters v. Grimes,* supra, on which the decision in *Froman v. Jones* was largely based, was a suit for an accounting. As shown by the abstract of record therein, the decree from which one of the defendants unsuccessfully attempted to appeal ordered the defendants as trustees to render an accounting to the plaintiffs. It was held that such a decree was interlocutory, and the appeal was dismissed. The court said in that connection:

" . . . One of the tests in determining whether a judgment or decree is final is: 'If no other action of the court is required to dispose of the cause, it is final.' Other tests are: Is the order or decree one which determines the rights of the parties so that no further questions can arise before the court rendering it, except such as are necessary to be determined in carrying it into effect, or is the judgment or decree 'one which concludes the parties as regards the subject-matter in controversy in the tribunal pronouncing it'? This question has been so fully considered and decided with such finality that anything more than a mere citation of authorities could add nothing to what has been previously said by this court."

In support of the foregoing statement the court cited, among others, the case of *Marquam v. Ross,* supra.

*Muellhaupt v. Strowbridge Estate Co.,* 136 Or. 99, 298 P. 186, cites with approval and follows *Winters v. Grimes,* supra, which fact is noted in *Froman v. Jones,* supra. By the decree in *Muellhaupt v. Strowbridge Estate Co.,* a receiver was appointed for the Joseph A. Strowbridge Estate Co., and that company was ordered to make an accounting to the receiver. The defendant attempted to appeal from that order and the appeal was dismissed on the ground that the decree which the defendant sought to have reviewed was not final. According to the holding in that case, no appeal lies from an order appointing a receiver when the principal relief sought is an accounting, which has been ordered but not rendered.

The main object of the instant suit was to have the plaintiff declared the owner of the real and personal property in litigation. The decree appealed from was a final determination as to such ownership. And upon the court's adjudging that the plaintiff was the owner an accounting by the defendants followed as an incident to that determination. Inasmuch as the rights of the parties in the property were adjudicated, nothing further remained to be done by the court to carry the decree into effect so far as concerned the ownership and possession of the real and personal property. The decree effected a transfer of the title to the real property to the plaintiff, in the event that Emigrant Creek Land Company did not, as ordered by the court, within fifteen days from the date of such decree, execute and deliver to the plaintiff a conveyance of such property. Delivery of the personal prop-

erty by the defendants to the plaintiff was directed by the decree "upon release of jurisdiction of said property from the circuit court of Lake county, subject to the lien, if any, of Gene Mazeris".

The jurisdiction of the circuit court for Lake county over the personal property involved in this litigation, mentioned in the decree herein, had reference to an execution issued out of that court on a judgment in favor of one Ahlstrom against Lyon, the plaintiff in this suit, on which execution the personal property concerned herein was attempted to be sold. The validity of that sale was under attack and had not been determined by the circuit court for Lake county at the time of entry of the decree in the case at bar. The circuit court for Harney county therefore, in the instant suit, refused to consider that question. After the appeal was taken in the case at bar, this court affirmed the order of the circuit court for Lake county setting aside and vacating the sale on execution: *Ahlstrom v. Lyon,* 169 Or. 629, 131 P. (2d) 219.

In the suit before us the circuit court, after determining the ownership of the property in litigation, provided in the decree that "the costs will be determined upon final decree." In other words, the question of costs was left until after a final decision following an accounting. In that respect, the decree from which this appeal was taken differs from that in *Marquam v. Ross,* supra, by which the court awarded to the plaintiff therein costs and disbursements. The fact that the court in the instant case reserved the question of costs until after the accounting did not affect the finality of its determination as to the ownership of the property.

■ It has many times been held by this court that costs are a mere incident to the judgment and that a

controversy over disbursements "would not delay the entry of the judgment nor would the final decision of that question amount to a modification of the judgment or extend the time in which to appeal": *Lemmons v. Huber*, 45 Or. 282, 77 P. 836. See also: *Wadhams v. Allen*, 45 Or. 485, 78 P. 362; *School District No. 30 v. Alameda Construction Co.*, 87 Or. 132, 144, 169 P. 507, 788; *In re Will of Pittock*, 102 Or. 159, 210, 199 P. 633, 202 P. 216, 17 A. L. R. 218; *State v. Way*, 120 Or. 134, 140, 249 P. 1045, 251 P. 761.

■ We can perceive no reason for holding that the decree here involved is not final and appealable, merely because the question of costs is reserved until an accounting is had. The court probably could not determine who was entitled to costs or the amount thereof, prior to an accounting.

In *Froman v. Jones*, supra, attention is directed to that part of § 7-501, Oregon Code 1930 (now § 10-801, O. C. L. A.), which provides that for the purposes of appeal an interlocutory decree in a suit for the partition of real property shall be deemed a judgment or decree, and it is then stated that an interlocutory decree of any other nature is not appealable.

The statute relating to appeals was enacted in the civil code of 1862, in the same language that appears in § 547, B. & C., hereinabove quoted. The first change in the statute was made in 1907 (§ 6, chapter 162, Laws 1907), when it was amended so as to grant a right of appeal from an order setting aside a judgment and granting a new trial. Prior to that amendment this court had held that an order granting a new trial was not appealable. See *McCartney v. Shipherd*, 60 Or. 133, 117 P. 814, Ann. Cas. 1913D, 1257, and cases therein cited.

In 1915, by chapter 88, Laws 1915, the statute relating to appeals was further amended by allowing an appeal from an interlocutory decree in a suit for the partition of real property. Before the 1915 amendment this court had held in a number of cases that an order directing the partition or sale of realty was, pending further proceedings, merely interlocutory and not appealable: *Bybee v. Summers*, 4 Or. 354; *Sterling v. Sterling*, 43 Or. 200, 72 P. 741; *Kesler v. Nice*, 54 Or. 585, 104 P. 2. In *Marquam v. Ross*, supra, in differentiating between interlocutory and final decrees, the opinion pointed out that a decree determining the rights of the respective parties to real estate and directing a partition or sale thereof was, without further proceedings, not a final and appealable order.

In making the amendments of 1907 and 1915 the legislature undoubtedly took cognizance of the above decisions of this court and intended to enlarge the right of appeal. It did not attempt to prevent an appeal in those instances in which the court had held that the right of appeal existed, as, for example, in circumstances such as shown in *Marquam v. Ross*, supra.

The decree appealed from in the case at bar, although denominated interlocutory, was in effect final and not interlocutory, because determinative of the principal issue involved. The substance of the order, and not the name given it, establishes its nature. In accord with the reasoning and ruling in *Marquam v. Ross*, supra, it is our opinion that the principal issue between the litigants herein was determined by the order under consideration, and that such order was therefore final, consequently appealable.

Were this not the case, the defendants would be deprived of the title and possession of the real and personal property involved, long before the entry of

the decree on the accounting, and would be denied the right to have the *res* remain in *statu quo* until a final determination of the controversy could be had in this court. An appeal after the entry of a decree on the accounting might be unavailing because not effectual to stay the enforcement of that part of the decree affecting the ownership and possession of the property. The decree appealed from in the instant case, as that in *Marquam v. Ross*, supra, was susceptible of immediate enforcement, whereas in *Froman v. Jones*, supra, *Winters v. Grimes*, supra, and *Muellhaupt v. Strowbridge Estate Co.*, supra, the decree attempted to be appealed from lacked finality.

The principal ground urged by the appealing defendants to defeat any recovery by the plaintiff is that he is not in court with clean hands. They assert that the plaintiff in August, 1938, transferred the personal property and assigned the contract to purchase the land here involved to the defendant Underbit Sheep Corporation for the purpose of hindering, delaying and defrauding his creditors, and that he is therefore not entitled to any relief in a court of equity.

In order better to understand the issues thus raised by the appealing defendants it will be necessary to review at some length the facts developed in the trial of this case. The plaintiff, Dr. Lyon, came to Lakeview, Oregon, in 1908 or 1909 and since that time has been practicing there his profession of dentistry and has also been engaged in raising sheep. Gene Mazeris came to this country in 1911 and up to the time of the trial had not become a citizen of the United States, although he had shortly before that time filed his first papers. In 1926 or 1927 he married Dr. Lyon's sister.

Dr. Lyon and Mazeris in 1925 entered into a partnership in the sheep business. This lasted for about two years, at the end of which time Mazeris bought out Dr. Lyon's interest and took the sheep to Fort Bidwell in Surprise valley, California, where he remained until 1934 or 1935. He and Dr. Lyon were not on friendly terms for approximately ten years following the conclusion of their business partnership.

Prior to July, 1937, Dr. Lyon had been carrying an account in the Bank of Lakeview. In July of that year most of the assets of the Bank of Lakeview were acquired by The First National Bank of Portland. At that time Dr. Lyon owed the Bank of Lakeview $23,499.33. There was due him, however, from the federal government approximately $22,000 for land purchased from him by the government.

Early in September, 1937, Mazeris and Dr. Lyon entered into an arrangement by which Mazeris was to take charge of Dr. Lyon's sheep business. We are not, however, concerned with the details of that arrangement. Two or three months later Dr. Lyon was notified to give possession of the land sold by him, and it then became necessary to find other pasturage for the sheep. Range land was leased, and after some unprofitable experience in that connection Dr. Lyon in the spring of 1938 entered into a contract to buy the two tracts of land involved in this litigation. Under the contract of purchase he agreed to pay $6,000 in addition to assuming a mortgage on the land for a like amount. He borrowed the money and paid the owner $1,200 or $1,500, on which point the record is not entirely clear.

Apparently the indebtedness of Dr. Lyon to the Bank of Lakeview in the summer of 1937, which was assigned to The First National Bank of Portland,

and the advances made to him by the latter bank during the summer and fall of that year, were paid by Dr. Lyon or reduced to a small amount in the winter of 1937-1938. However, by August, 1938, when he made the transfer to the Underbit Sheep Corporation, Dr. Lyon owed The First National Bank of Portland for other advances approximately $12,000.

There were outstanding in August, 1938, two judgments against Dr. Lyon, both obtained in the circuit court for Lake county. One was in favor of James McKee and was entered November 24, 1937. In August, 1938, it amounted with interest to over $2,600. The other judgment was in favor of E. C. Ahlstrom and was docketed January 28, 1938. In August of that year there was due on it, including interest, over $700. Both judgment creditors had attempted but failed to obtain payment of any part of the respective judgments.

Dr. Lyon was also indebted to Leon W. Frakes in the sum of $3,318.67 and interest thereon from April 10, 1933, less $150 which he had paid as interest. He was further indebted to George Hankins or his estate in an amount exceeding $1,000. In addition, he owed bills aggregating several thousand dollars. The only creditors who were pressing him, according to Dr. Lyon, were the two judgment creditors above mentioned.

In the early part of August, 1938, McKee's attorney, who lived at Burns, was threatening to sell Lyon's sheep on execution. Mazeris, who was then in charge of the sheep, became worried and consulted Joe Abasolo, a resident of Burns, as to what could be done about the matter. Abasolo was a man of means, who had had considerable experience in operating sheep ranches and dealing in sheep and wool. Apparently

Mazeris wanted Abasolo's assistance in financing the Lyon sheep business until the 1938 wool clip and the marketable sheep could be sold. Before taking any action Abasolo consulted his attorney at Burns, who advised him that in order to avoid personal liability a corporation should be formed and the sheep transferred to it. About August 22 or 23 the Underbit Sheep Corporation was organized by that attorney, with a capitalization of $5,000. At that time Dr. Lyon's sheep had been for many months in Harney county, on the land involved in this litigation.

Immediately after it was decided to form the corporation, Mazeris went to Lakeview and procured from Dr. Lyon a bill of sale to Underbit Sheep Corporation covering 2,700 ewes, 2,600 lambs, 80 bucks and all the equipment owned and used by Dr. Lyon in connection with the sheep business, also an assignment of the contract that Dr. Lyon had for the purchase of the two tracts of land.

Dr. Lyon testified that when Mazeris came to him and requested the bill of sale and the assignment Mazeris represented to him that James McKee owed Mazeris $1,500 and that if the transfer were made Mazeris could induce McKee, in settlement of the claim of Mazeris against him, to cancel the judgment which McKee had against Dr. Lyon. For making such a settlement Mazeris was to have, according to Dr. Lyon's statement, stock in the newly formed corporation of the value of his claim against McKee.

The plaintiff testified that he knew that the claim of Mazeris was originally against Cog McKee, a son of James McKee, and that Mazeris represented to him, Dr. Lyon, that the elder McKee had agreed to pay that indebtedness of his son. Mazeris admitted that Cog McKee owed him $1,500, but denied that

the elder McKee agreed to pay that indebtedness, and also denied that he ever made any representation to Lyon that the elder McKee would pay his son's debt or that he, Mazeris, would procure a settlement of James McKee's claim against Lyon.

Upon the organization of Underbit Sheep Corporation ninety-eight per cent of its capital stock was issued to Abasolo, and the remainder to office employees of Abasolo's attorney. Through this corporation, under the guidance of Abasolo, new loans were obtained on the security of the sheep; and with such funds and the proceeds from the sale of sheep and wool, much of Dr. Lyon's previous indebtedness to The First National Bank of Portland was discharged and the balance of the purchase price of the above-mentioned two tracts of land was paid and title taken in the name of Underbit Sheep Corporation.

Abasolo, to relieve himself of future responsibility for the conduct of the business of the sheep corporation, caused that corporation to deed the two tracts of land on September 19, 1939, to Pete Ebar of Burns, Oregon, and to give him a bill of sale of the personal property of the corporation. At that time Ebar loaned $2,500, which was used in caring for the sheep. About eight months later, on May 16, 1940, Ebar conveyed the land to Emigrant Creek Land Company, a corporation organized about that time by some of the defendants, and gave to Mazeris a bill of sale covering all the sheep and other personal property. On the same day, May 16, 1940, Mazeris gave to Ebar a chattel mortgage on the sheep and other personal property, as security for the $2,500 previously loaned by Ebar. The property, both real and personal, was so held and encumbered at the time this suit was instituted.

Abasolo did not at any time contend that he was the owner of the stock of Underbit Sheep Corporation that had been issued in his name, or that he had any right to hold it otherwise than as security for money owed him by the corporation. Nor did Ebar claim that he ever owned the personal property or the land. He obtained the bill of sale of the personal property and the deed to the land as security for loans made by him. Both Abasolo and Ebar, who were parties defendant in the circuit court, were apparently satisfied with the decree of that court, as neither has appealed. The chattel mortgage held by Ebar at the time the case was tried was protected by the decree of the circuit court. Emigrant Creek Land Company paid no consideration for the deed conveying the land to it. The purpose of that conveyance, according to Mazeris, was to obtain additional funds for financing the sheep business, by having that company mortgage the real property.

 The gravamen of the plaintiff's case is thus introduced in paragraphs VI and VII of his supplemental and amended complaint:

"That the defendant, Gene Mazeris, falsely and fraudulently represented to plaintiff, with the intention of deceiving and defrauding the plaintiff of his property, that he had a claim against McKee for approximately the same amount owed McKee by plaintiff and that if plaintiff would consent to forming a corporation that he, the defendant Gene Mazeris, would settle the amount due to Mr. McKee and would receive therefor an interest in the corporation to be formed.

"That said representations were false and were then and there known by the defendant Gene Mazeris to be false; that in truth and in fact the defendant Gene Mazeris did not then [have] and

has not now a claim against McKee for $1,500 or any other sum whatsoever.''

It is then alleged that the plaintiff, in reliance upon the false representations made by Mazeris, was induced to and did execute a bill of sale to Underbit Sheep Corporation for the personal property here involved and assign to that corporation his contract to purchase the two tracts of land above mentioned. It is further alleged in this pleading that some of the individual defendants, with knowledge of the false and fraudulent representations made by Mazeris, conspired with Mazeris in effecting the organization of the two defendant corporations, in causing the subsequent transfers of real and personal property above detailed, and in aiding and assisting Mazeris to defraud the plaintiff of such property. The supplemental and amended complaint also alleges that the defendants have possession of the personal property and hold title to the realty and that they claim to own both.

In our opinion, the plaintiff has wholly failed to sustain the material allegations of his supplemental and amended complaint. Inasmuch as he charged Mazeris with fraud, the burden was on the plaintiff to prove that charge by clear and convincing evidence: *Metropolitan Casualty Insurance Co. v. Lesher*, 152 Or. 161, 52 P. (2) 1133; *Broad v. Kelly's Olympian Co.*, 156 Or. 216, 66 P. (2d) 485; *Horner v. Pleasant Creek Mining Corporation*, 165 Or. 683, 107 P. (2d) 989, 109 P. (2d) 1044.

■ The evidence to which we are about to refer, introduced in support of the averments in the defendants' answer that the transfers of the plaintiff's property to Underbit Sheep Corporation were made for the purpose of hindering, delaying and defrauding the

plaintiff's creditors, negatives the plaintiff's contention that he was acting in reliance upon the alleged false and fraudulent representations of Mazeris and clearly shows that in transferring his property the plaintiff was attempting to place it beyond the reach of his creditors. In his own testimony the plaintiff offered little explanation as to why he made those transfers of property. When questioned by his attorney as to the purpose thereof, he thus testified:

"A. It was on account of . . . of James McKee, . . . I owed James McKee fifteen hundred dollars about that time and Mazeris claimed that McKee owed him fifteen hundred dollars and he came over to Lakeview the first of July or something like that and said he [McKee] had a lawyer named Schmalz who said he would attach the sheep if it wasn't paid.

"Q. Who had a lawyer? McKee?

"A. Yes, he has Schmalz. And he [Mazeris] wanted McKee to pay that and the only way to do was to have McKee pay him and he would just swap and I would give him a fifteen hundred dollar interest in the sheep.

"Q. That was the reason you transferred the sheep?

"A. Yes."

On cross-examination the plaintiff stated that he had found out that Mazeris had not paid the McKee claim. He then testified as follows:

"Q. What were the other sources that gave you the information that he hadn't done that?

"A. One reason was that when we incorporated he said that he hadn't settled with him [McKee] yet. He said, . . . Gene told me that he spoke to him about it and he [McKee] said he wasn't going to bother with him and he was going to jump the sheep; that is what Gene says.

"Q. That is one of the reasons you incorporated, because Gene said that; is that right?

"A. The reason was . . . not entirely, but Gene came over there and was all excited and said that Schmalz over here was attorney for James McKee and said, 'We have got to do something.' And I asked him why he didn't pay it and he said he didn't have the money and he said we would settle up without it.

"Q. Asked who?

"A. I asked Gene why he didn't settle up.

"Q. Gene Mazeris didn't owe McKee, did he?

"A. Cog McKee owed Gene Mazeris fifteen hundred dollars, he claimed, for these sheep.

"Q. Yes?

"A. And he claimed that James McKee agreed to pay for them, and so he wanted to incorporate so as to protect the sheep and get a settlement with him, make him [McKee] pay. 'Make the old fellow pay,' he says."

In regard to his conversation with Mazeris while the latter was at Lakeview, the plaintiff said: "Well, he [Mazeris] said that if we would incorporate that he could collect his bill from McKee, and I thought that if McKee owed him that he should pay and I knew that I should pay Mr. McKee and so we . . . anyway, he brought these papers over."

It was at that time that the bill of sale was signed by Dr. Lyon. As to the transfers of real and personal property, Dr. Lyon testified:

"Q. Well, what did you understand him [Mazeris] to mean when he said he would make the old man pay for the corporation?

"A. Well, it gave more time. It would block him [McKee] out from attaching the sheep and give him [Mazeris] more time to make the settlement. In that way he was more liable to get an adjustment of the two accounts. He [Mazeris]

said if he [McKee] would attach the sheep and sell them, it would hurt the business.

"Q. In other words, it would put you and him in a better position to make the settlement, that is what you mean?

"A. Yes.

&ast; &ast; &ast; &ast; &ast;

"Q. Well, now, Doctor, as a matter of fact, isn't this true that when you signed this bill of sale transferring this property to the Underbit Sheep Corporation, your purpose in doing that was to keep your creditors from levying upon this property?

"A. There was no creditors bothering me except McKee and Ahlstrom.

"Q. Well, was it to keep McKee and Ahlstrom from doing that?

"A. Well, it was because Gene was telling that Schmalz was going to attach the sheep. That was the reason that this corporation was formed. No creditors was bothering me. Everybody in Lakeview knew that I had money coming, and I still have, to settle up these other accounts.

"Q. And it was to keep these two creditors, Ahlstrom and McKee, from levying on you?

"A. The only thing was to help Gene to collect the fifteen hundred dollars.

"Q. Well, Gene had no claim against Ahlstrom, had he?

"A. As a matter of fact, I didn't owe Ahlstrom."

In contradiction of the above statement that he did not owe Ahlstrom, there was introduced in evidence a certified copy of the judgment of Ahlstrom against Lyon, which had been docketed January 28, 1938, and the plaintiff admitted that the judgment had not been paid.

Mazeris testified that he learned during the summer of 1938 that McKee was intending to have Lyon's

sheep sold to satisfy his judgment, and that he immediately informed Dr. Lyon of that fact. Dr. Lyon, he testified, "said we have to do something to protect these creditors—to protect the sheep, I mean, from the creditors. 'You got enough sheep to pay for the bills, and see what you can do,' that is what he told me." Questioned as to whether the plaintiff at any time suggested that the sheep be turned over to some one else, Mazeris answered: "Dr. Lyon suggested that we have to do something in order to protect the sheep and get plenty of money to pay for the bills."

The bill of sale for the personal property and the assignment of the contract for the purchase of real property were contained in one document, which was executed by Dr. Lyon on August 23, 1938, but was not filed with the county clerk for record until October 10, 1938. According to Dr. Lyon's testimony, the only defendant to whom he mentioned that he had or was claiming any interest in the personal property and the real property after the assignment and until 1940, was Mazeris. Dr. Lyon had not, during that period of time, received any report as to how the sheep business was being conducted, nor had he received any revenue or returns from that business. He made no inquiry as to whether Mazeris had succeeded in satisfying the McKee judgment. Although the personal property and the land were subsequently transferred to Ebar in the fall of 1939, Dr. Lyon knew nothing about that matter, or about the later transfers in the spring of 1940, until the fall of 1940.

After Dr. Lyon gave the bill of sale and assigned his land-purchase contract to Underbit Sheep Corporation, his indebtedness greatly exceeded his remaining assets. The only assets owned by him after those negotiations were one hundred eighty acres of land in

Lake county, against which was a mortgage of $1,000 in favor of the state land board; his professional equipment, which he said was old; and some bills receivable· for professional services, the amount of which was not mentioned. The value of the land in Lake county was not much more than the amount of the mortgage against it.

The conclusion is inescapable that in transferring his property to Underbit Sheep Corporation in August, 1938, Dr. Lyon was attempting to hinder and delay McKee in obtaining satisfaction of his judgment. Even though we give Dr. Lyon's testimony the construction most favorable to him, there remains his admission that he transferred his assets in order to gain time in which to adjust all his obligations. His counsel argues that the transfers were not fraudulent and that the plaintiff should be commended rather than censured for his action, which counsel describes as an effort to protect all the plaintiff's creditors.

A similar contention appears to have been advanced in *Shapiro v. Wilgus*, 287 U. S. 348, 354, 77 L. E. 355, 53 S. Ct. 142, 85 A. L. R. 128, and to have been approved by the United States circuit court of appeals for the third district. The supreme court in its opinion stated that, ''The sole purpose of the conveyance was to divest the debtor of his title and put it in such a form and place that levies would be averted'', and proceeded as follows:

> ''. . . After a recital of the facts the court stated in substance that the aim of the debtor was to prevent the disruption of the business at the suit of hostile creditors and to cause the assets to be nursed for the benefit of all concerned. Perceiving that aim and indeed even declaring it, the court did not condemn it, but found it fair and lawful.

In this approval of a purpose which has been condemned in Anglo-American law since the Statute of Elizabeth (13 Eliz., ch. 5), there is a misconception of the privileges and liberties vouchsafed to an embarrassed debtor. A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them. Many an embarrassed debtor holds the genuine belief that if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full. Means v. Dowd, 128 U S. 273, 281. The belief, even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay.''

See also, to like effect: *Sabin v. Columbia Fuel Co.,* 25 Or. 15, 22, 34 P. 692, 35 P. 854, 42 Am. St. Rep. 756; *Clarke v Philomath College,* 99 Or. 366, 193 P. 470, 195 P. 822; and 27 C. J., Fraudulent Conveyances, page 504, § 171.

■ The plaintiff is not in court with clean hands. He is seeking to establish his ownership and right to possession of property which he admittedly transferred to hinder and delay his creditors. In doing that he perpetrated a fraud. In 27 C. J., Fraudulent Conveyances, at page 655, § 424, we find this statement:

"As a general rule, the courts will not aid a fraudulent grantor, his heirs, his assigns, his privies, etc., to reclaim or recover from his transferree property transferred in fraud of creditors, or its proceeds. The courts will not decree a reconveyance."

■ From 24 Am. Jur., page 267, § 118, the following is quoted:

"As a general rule, subject to certain modifications and exceptions [not applicable to the case at

bar] hereinafter noted, where the contract for conveyance of the property has been executed by the parties, neither the transferrer nor the transferree may claim relief from the consequences thereof. The law will leave them in the position in which they have placed themselves, refusing affirmative aid to either of the fraudulent participants. This is true not only as to the original parties to the fraudulent transaction, but also as to their heirs and all other persons claiming under them, no equitable rights having intervened to protect the complainant. The equitable maxim, 'he who comes into equity must come with clean hands,' governs the court's action in the circumstances.''

The foregoing excerpts are supported by copious citations from many jurisdictions. The principle is so well established that it is not necessary to set forth here a list of the authorities.

The decree of the circuit court is reversed and the cause remanded, with instruction to dismiss the suit. No costs will be allowed in this court.

The late Mr. Justice RAND did not participate in this decision.